**BILLEAUD PLANTERS, Inc., et al.,**
**Appellants,**

v.

**UNION OIL COMPANY OF CALIFORNIA, Appellee.**

No. 16433.

United States Court of Appeals
Fifth Circuit.

May 24, 1957.

Rehearing Denied June 27, 1957.

Donald Labbe, Lafayette, La., Voorhies & Labbe, Lafayette, La., for appellants.

Cullen R. Liskow, Austin W. Lewis, Lake Charles, La., Liskow & Lewis, Lake Charles, La., of counsel, for defendant-appellee.

Before BORAH, RIVES, and BROWN, Circuit Judges.

BORAH, Circuit Judge.

Appellants, Billeaud Planters, Inc. and others [1] who were joint owners of seven-eighths of the mineral rights in and under a 320-acre tract of land in Tigre Lagoon Field, Vermilion Parish, Louisiana, brought suit in the district court against their mineral lessee, Union Oil Company of California, to recover damages for drainage of gas from the "C" sand underlying their land, which was allegedly sustained between December, 1950, and February, 1954, as a result of Union's operations on adjoining tracts of land on which it also owned mineral leases. A trial was had by the court without a jury and judgment was entered for the defendant and the complaint was dismissed. This appeal followed.

The undisputed facts are these: On March 4, 1944, Billeaud Planters, Inc. executed an oil, gas and mineral lease to appellee's assignor covering certain lands situated in the Tigre Lagoon Field.[2] The lease by its express terms provided that it was to remain in force for a primary term of three years and nine months from date, and so long thereafter as oil, gas, sulphur or other mineral is produced from said land, or drilling or reworking operations are prosecuted. Among the obligations of the lessee, the lease provided in paragraph 14 that:

"In the event a well or wells producing oil in paying quantities should be brought in on adjacent lands not owned by the Lessor *and within six hundred sixty (660) feet of said land,* Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances. * * * "[3]

1. Mrs. Amelie C. Billeaud, wife of Andre Billeaud, and Lionel J. Billeaud, Mrs. Aimee B. Labbe, Mrs. Camille B. Breaux, and Mrs. Louisette B. Trousdale, all heirs of Andre Billeaud.

2. When the lease was executed, Billeaud Planters, Inc. was the owner of the land and all mineral interests therein, and thereafter the other appellants acquired their rights to the minerals underlying this land.

By subsequent agreements, all but 320 acres of the 960 acres originally covered by the lease was released by the lessee pursuant to the release provisions contained in the lease.

3. Emphasis supplied throughout.

And with respect to enforcement of the lease, it was expressly provided in paragraph 12, that:

"In the event Lessor considers that Lessee has not complied with all its obligations hereunder, *both express and implied,* Lessor shall notify Lessee in writing, setting out specifically in what respects Lessee has breached this contract. If within sixty (60) days after receipt of such notice, Lessee shall meet or commence to meet the breaches alleged by Lessor, Lessee shall not be deemed in default hereunder. *The service of said notice* and the lapse of sixty (60) days without Lessee meeting or commencing to meet the alleged breaches *shall be a condition precedent to any action by Lessor for any cause hereunder.* Neither the service of said notice nor the doing of any acts by Lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder."

Following the execution of the lease and in the year 1947, appellee drilled a well on the Billeaud tract to a depth of 12,229 feet, traversing three separate productive sands known as "Planter's" sand, "C" sand, and "D" sand. This well, subsequently designated as Unit IX, was completed in the lowest or "D" sand, but gas was not immediately produced and the well was "shut-in" for approximately three years for want of pipeline facilities.

During the period when this well was "shut-in", appellee, who was the owner or operator of other leases in this field, completed six wells on adjacent and nearby tracts in the "C" sand. These wells which were designated as Units II, VI, VII, VIII, X and XIII R, were located north, northwest, west and south of the Billeaud tract at distances ranging from 525 feet to in excess of 3,000 feet. There were no specific State orders controlling the operation of the field, except those relating to the allowable take of gas therefrom, and appellee voluntarily operated the field on 320-acre spacings which were accepted by the respective property owners, including appellants herein. The evidence shows that appellee began pipeline production from the Tigre Lagoon Field in December, 1950, and from that date to February, 1954, the Billeaud well produced from the "D" sand, whereas the six other aforementioned wells produced from the "C" sand.

In the meantime and in the month of December, 1953, appellants had employed a geologist to inquire as to the productivity of certain other lands in the area in which they had mineral interests and also to investigate and give his opinion as to whether or not appellee was developing the Billeaud tract as a prudent administrator. When the geologist submitted his report, appellants learned for the first time that Unit VIII was located *within 660* feet of the Billeaud tract, and that Units II, VI, VII, VIII, X, and XIII R were not producing from the "D" sand, but from the "C" sand. On the basis of the geologist's report appellants concluded that the "C" sand underlying the Billeaud tract was being drained by adjoining wells and by letter of January 12, 1954, appellants demanded that appellee take steps to prevent drainage from the "C" sand by wells on adjoining lands. Production from the "D" sand having begun to ebb by that time, appellee immediately reworked the Billeaud well and recompleted it in the "C" sand on February 22, 1954, some forty-two days after receipt of appellant's demand. The Billeaud well has been producing from the "C" sand in paying quantities since that time.

It is conceded by appellants that the recompletion of the well in the "C" sand complied with the demand made by them on January 12, 1954, and appellant is seeking here only to recover for alleged drainage from that sand prior to that recompletion. The gravamen of the complaint is that appellee violated paragraph 14 of the original lease in that it failed to drill and complete a well on the Billeaud tract in the "C" sand to offset the

Unit VIII well which was located 525 feet south of the Billeaud tract, and also failed to fulfill its *implied obligations under the lease:* "(1) to properly develop and operate the lease and produce the minerals for the mutual benefit of Lessor and Lessee, (2) to protect the lease from drainage or depletion by outside wells from which the royalty owners do not receive royalty, and (3) to pay the royalty owners their proportionate share of the value of the gas and condensate recovered or drained by Lessee from said land from wells located on or off the leased premises." For answer, appellee denied that the complaint set forth a claim on which relief could be granted, denied generally the allegations of the complaint and set up as its principal defense that appellants were not entitled to relief for the reason that they had made no demand on appellee in connection with the "C" sand prior to their letter of January 12, 1954. And as appellee had complied with their demand within sixty days, as provided in paragraph 12 of the lease, appellants have no right or cause of action for any alleged failure to comply with the lease contract by production from the "C" sand prior to February 22, 1954, and that judgment should be rendered against appellants and their suit should be dismissed.

The trial court found the facts substantially as set forth above and in addition thereto also found that the Unit VIII well was located 525.513 feet south of the Billeaud property line; that there were no known faults which would interfere with drainage between the Billeaud well and any of the above-mentioned six wells which were producing from the "C" sand; and that there were no unitization agreements or State orders integrating the various sands in the field, or specific State orders controlling the operation of the field besides the orders relating to the allowable take of gas therefrom. The trial court further found that an offset well producing from the "C" sand on the Billeaud property would have produced substantially the same quantity of gas and condensate as was produced from the nearby Unit VIII well from December, 1950 to February 22, 1954, and that appellants would therefore have received $72,359.91 in royalty from the offset well during the period involved, had such an offset well been drilled in 1950, but that appellants had sustained a drainage loss from the "C" sand underlying the Billeaud tract in the amount of $46,714.44. Finally, the court found that appellee had not attempted to hide the location or production data of the several adjoining wells, and was not guilty of any fraud or concealment or any other acts which tended to hinder, prevent or impede appellants from ascertaining the true facts relative to their well and those adjoining. On the basis of these findings the court concluded that since appellants did not comply, prior to December, 1953, with the conditions precedent set forth in paragraph 12 of the lease agreement and make demand on appellee to prevent the damage by drainage, they were precluded from recovering damages for drainage which occurred prior to that time. This appeal followed.

Insisting in numerous particulars that the court erred in denying recovery to appellants because appellee had not been placed in default, and urging upon us divers grounds hereinafter to be considered in support of their claim that paragraph 12 of the lease is inapplicable, appellants vigorously contend that the judgment of the district court should be overturned and judgment entered in their favor in the sum of $72,359.91, with interest from date of judicial demand.

■ We take it to be fundamental under Louisiana law that all legal agreements have the effect of law upon the parties, and they are bound by their agreement regardless of harsh consequences, provided the agreement is not contra bonos mores or in violation of some prohibitory law. Articles 1901,

**18**

1945, and 1764, LSA–Civil Code of 1870.[4] Here the parties to the lease contract expressly stipulated and agreed that notice of any alleged breach of *any obligation* under the lease, *whether express or implied,* must be given at a specified time and in a specific manner as *a condition precedent to any action by the lessor for any cause thereunder.* Hence, before appellants could claim the right to damages for drainage whether by virtue of a breach of appellee's express or implied obligations they were by their own contract terms required as a prerequisite to the recovery of damages, "to notify Lessee in writing, setting out specifically in what respects Lessee ha[d] breached this contract." The conditions of the contract are clear and unambiguous and are to be construed as the parties must be supposed to have understood them at the time of its execution. Our plain duty is confined strictly to the ascertainment of the limitations of the rights and obligations of the contracting parties as they have defined them for themselves.

Appellants argue here as they did in the trial court, that they were excused from compliance with paragraph 12 of the lease agreement for the reasons, among others: (1) that appellee's operations on adjoining leases constituted an active breach of the contract and consequently this case is governed by Article 1932 of the LSA–Civil Code which abrogates the requirement of putting in de-fault where there is an active violation of the contract; (2) that appellants had no knowledge of the breach until after the drainage complained of had already occurred; (3) that appellee had superior knowledge of the breach and did not act in good faith in discharging its obligations under the lease; and (4) that the complaint stated a cause of action in tort and therefore a putting in default was not required.

■■ We think it plain that none of these objections furnishes a legal reason to excuse compliance with paragraph 12 of the lease agreement. The facts, as we have detailed them above, clearly show that appellee's breach consisted solely of its failure or omission to do that which it had bound itself to do, *i. e.,* to drill an offset well, and it is the codal law of Louisiana that an omission or failure to act is not an active, but only a passive breach of contract. Article 1931, LSA–Civil Code of 1870; [5] Godchaux v. Hyde, 126 La. 187, 52 So. 269. And under Article 1933 of the LSA–Civil Code, "When the breach has been passive only, damages are due from the time that the debtor has been put in default."

■ As to appellants' second point, it should be borne in mind that this arms' length lease agreement was a commutative contract containing mutual reciprocal obligations. Brock v. Pan American Petroleum Corp., 186 La. 607, 173 So.

4. Art. 1901. "Agreements legally entered into have the effect of laws on those who have formed them.

"They can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.

"They must be performed with good faith."

Art. 1945. "Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:

\*      \*      \*      \*      \*      \*      ■

"*Second*—That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;

"*Third*—That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;

"*Fourth*—That it is the common intent of the parties—that is, the intention of all—that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract."

Art. 1764. "All things that are not forbidden by law, may legally become the subject of, or the motive for contracts \* \* \*."

5. Art. 1931. "A contract may be violated, either actively by doing something inconsistent with the obligation it has proposed or passively by not doing what was covenanted to be done, or not doing it at the time, or in the manner stipulated or implied from the nature of the contract."

121. For example, there was a typewritten addition to the printed lease form which required that the "Lessee shall, after receipt of written request from Lessor, furnish Lessor with a copy of Schlumberger logs on any well or wells drilled on the premises held hereunder." This provision is in harmony with the provisions of paragraph 12, and clearly manifests that it was the intention of the parties that the lessor would make technical inquiries, and would exercise reasonable diligence to learn the facts about the lessee's operation of the leased premises. This appellants failed to do. As a matter of fact they gave the subject no thought, made no investigations did not attempt to check the Conservation Commission records locally or at the State Capitol, nor did they communicate with a geologist until December, 1953. It is therefore clear on this record that their failure to learn the facts may not be attributed to appellee's superior knowledge or to any affirmative action on appellee's part.

The evidence here shows that appellee intended to drill the Unit VIII well 660 feet south of the Billeaud tract, but that it was in fact drilled only 525.513 feet from appellants' land because of an erroneous survey by appellee's agent; and when appellee discovered the error, it made no attempt to conceal the facts. It is therefore apparent that had appellants employed their geologist in 1950 instead of December, 1953, he would have been able then to ascertain the facts upon which appellants have based the instant claim, that is, the location and production data of the other nearby producing wells. The record standing thus we are in complete agreement with the trial judge that appellants were not relieved of the duty of making inquiry and of notifying appellee in writing, setting out specifically in what respects appellee had breached the contract, as was required by paragraph 12 of the agreement.

We come now to appellants' next contention that the suit here is both on contract and on tort, and that even if the provisions of the lease agreement relative to notice were binding on them as to the contract feature of the case, they were not binding on them insofar as the tort phase of the case was concerned.

We think appellants' claim that appellee's action in draining appellants' "C" sand by producing gas and condensate from adjoining leases constituted wrongful conduct and therefore tortious, finds no support in Louisiana law. This argument completely overlooks the fact that in order to found an action on tort there must be a breach of a general duty or obligation owed to the public, apart from the nonperformance of a contract. "A tort is a private wrong, independent of contract. It is a breach of legal duty, as distinguished from the breach of conventional duty." P. Olivier & Sons v. Board of Com'rs, 181 La. 802, 160 So. 419, 420. See also Gordon v. Stanley, 108 La. 182, 32 So. 531, 533. And what is important here is that there is no legal duty or obligation on the part of land owners to refrain from engaging in the lawful production of gas from their own lands, notwithstanding the fact that such production may cause drainage from the sands underlying adjoining lands. Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206, 5 A.L.R. 411; Louisiana Gas & Fuel Co. v. White Bros., 157 La. 728, 103 So. 23; and see McCoy v. Arkansas Nat. Gas. Co., 184 La. 101, 165 So. 632, 633. This is so for the reason that appellants are not the owners of the gas beneath their holdings, Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207, but have only the right to drill for the oil and gas and to become the owners of such minerals as they may bring into their possession. Higgins Oil & Fuel Co. v. Guaranty Oil Co., supra. Consequently, it cannot be here said that apart from the lease appellee's action was wrongful, illegal or amounted in law to an offense or quasi-offense. It is plain to us that the cause of action here sued upon exists solely because of the contract and for no other reason. Indeed, the whole basis of the demand in the complaint is that appellee

violated or failed to comply with the express and implied obligations of the lease. Accordingly, we find ourselves in agreement with the district court and hold that this action is founded upon contract and not upon tort.

We have carefully examined the other specifications of error assigned and are of opinion that in the light of what we have said above none of them merits discussion. For the reasons stated, the judgment of the district court is affirmed.

Affirmed.