**TEXAS OIL & GAS CORPORATION et al.,**
**Appellants,**

**v.**

**Juan M. VELA et al., Appellees.**

**No. 14479.**

Court of Civil Appeals of Texas.

San Antonio.

June 8, 1966.

Rehearing Denied July 20, 1966.

Geary, Brice & Lewis, W. S. Barron, Jr., Turner, Atwood, Meer & Francis, Dean Carlton, Dallas, G. C. Mann, Laredo, Robert R. Barton, Kerrville, Walter B. Morgan, Houston, for appellants.

Bobbitt, Brite, Bobbitt & Allen, San Antonio, Mann, Cronfel & Mann, Fansler & Fansler, Laredo, for appellees.

BARROW, Justice.

This suit was brought by appellees Juan M. Vela and three others as lessors, hereinafter referred to as appellees Vela, under an oil and gas lease, against four groups of owners of the working interest in such lease, to recover alleged deficiencies in royalty payments, as well as additional relief on the theory that the lease premises were being drained and had not been properly developed. Appellees L. A. Nordan and Hannah D. Gaines intervened and asserted that they were owners of part of the royalty interest, and sought to recover if appellees Vela recovered.

A judgment was entered, following a non-jury trial, that: (1) appellees recover from the various owners of the working interest specified sums totaling $52,789.55 as unpaid royalties and interest, during the period each respective appellant was working the lease; (2) appellant Texas Oil & Gas Corporation drill certain protection and development wells on the lease premises or suffer cancellation of the leasehold estate beneath the Upper Queen City sand; and (3) that future royalties be paid at the market price.

On April 1, 1933, appellees Vela executed an oil and gas lease to Thor Warner and C. E. Jamison, covering 1500 acres of land in Zapata County, located in what is known as the Lopeno Field. The original lessees assigned specific portions of this acreage to various parties who have since drilled and completed six producing gas wells in the Upper Queen City sand (located at a depth of 2025 feet to 2510 feet). Appellees admit their claim is controlled by the four-year statute of limitations, and that the relevant period of ownership under consideration is from February 1, 1960, through January 31, 1964. The owners of the working interest during that period were: (1) The American-Texas Group, in which appellee Hannah M. Gaines had a 25% interest, and Nordan & Co., a partnership of Claudia R. Eaves and appellee L. A. Nordan's two daughters and sons-in-law, had a 25% interest; (2) the "Venture Group" comprised of the Venture Petroleum Corporation and several individuals; (3) Delhi-Taylor Oil Corporation; and (4) Texas Oil & Gas Corp. (formerly known as Tex-Star Oil & Gas Corp.). While the case was

pending Texas Oil & Gas Corp. acquired all working interest of this leasehold estate down to 4,000 feet.

The six wells and the working interest of the respective owners during the relevant period are as follows:

| Well and Location | Ownership from February 1, 1960 through January 31, 1964 |
|---|---|
| San Juana Vela No. 1 and No. 2 (now Lopeno No. 20 and Lopeno No. 17), in the northwest half of Block 6 | Owned by Delhi-Taylor Oil Corporation from 2-1-60 to 4-1-63, and by Texas Oil & Gas Corp. from 4-1-63 to 2-1-64 |
| San Juana Vela—Venture No. 1 (now Lopeno No. 14) in Block No. 5, Porcion 20 | Owned by Venture Petroleum Corp. from 2-1-60 to 6-1-63, and by Texas Oil & Gas Corp. from 6-1-63 to 2-1-64 |
| San Juana Vela—Venture and American-Texas No. 2 (now Lopeno No. 15) in Block 1, Porcion 20 | Owned ½ by Venture Petroleum Corp. and ½ by American-Texas Group from 2-1-60 to 6-1-63, and ½ by American-Texas Group from 6-1-63 to 2-1-64 |
| San Juana Vela—American-Texas Group (now Lopeno No. 16) in the southwest half of Block 6, Porcion 20 | Owned by American-Texas Group from 2-1-60 to 2-1-64 |
| Lopeno No. 25 in Block 2, Porcion 21 | Completed on or about 9-1-63 and owned since such time to 2-1-64 by Texas Oil & Gas Corp. |

———◆———

The royalty provision of the Vela lease in question provides: "In consideration of the premises the said lessee covenants and agrees: * * * 2nd. To pay to lessor, as royalty for gas from each well where gas only is found, while the same is being sold or used off of the premises, one-eighth of the market price at the wells of the amount so sold or used, * * *."

The crucial issue in this case is the determination of the "market price at the wells." The appellants had paid 2.3¢ per mcf, as provided under a gas purchase contract entered into in 1935, to continue for the "life of the lease." The trial court found the market price to be 16.047¢, less a compression charge of 3¢ per mcf. Judgment was accordingly entered against the respective owners of the working interest for the difference between the market price of 13.047¢ and 2.3¢, for all gas sold from each Vela well during the relevant period, with interest at the rate of 6% per annum from the dates the gas was sold. After the trial, but before the judgment was entered, a compromise settlement was entered into between all appellees and the "Venture Group" and no appeal has been perfected in their behalf.

Appellants urge that there is no evidence to support the finding of market price of 16.047¢ per mcf, or, in any event, this finding is against the overwhelming weight and great preponderance of the evidence. Briefed with these points are other points complaining of testimony relative to prices paid under other gas contracts in the Lopeno Field, and urging that there is no evidence, or insufficient evidence, of demand for gas produced from the Vela lease at this price.

At the time gas was first discovered on the leased premises in 1934, there was no pipeline into the Lopeno Field. Nordan &

Morris, a partnership composed of appellee L. A. Nordan and John Morris, deceased husband of appellee Mrs. Gaines, as Seller, entered into a contract with the United Gas Public Service Company as Buyer, dated November 20, 1934, whereby United agreed to construct a pipeline to the Lopeno Field. Such contract gave United the exclusive right to purchase on a ratable basis all gas produced from the lands in the Lopeno Field in which Nordan & Morris had the gas rights for the life of the lease. The contract price is 3½¢ per mcf, which was reduced to 2.3¢ with the adoption of the Standard Gas Measurement Law, Art. 6066b, Vernon's Ann.Civ.St., in 1949. Nordan & Morris subsequently entered into several gas purchase contracts with various lease owners and operators in the Lopeno Field, under similar terms, including contracts with the lessees of appellees Vela, which were entered into in 1935 and 1937.

Since 1935, royalties on all gas sold on the leased premises, as well as other leases owned by appellants and covered by Nordan & Morris gas purchase contracts, have been paid pursuant to the terms of this contract. The rights of the Buyer under these contracts have been transferred by mesne assignments to Delhi Gas Pipeline Corp., a wholly owned subsidiary of appellant Texas Oil & Gas Corp.

Prior to 1960 the only pipeline into the Lopeno Field was the one constructed by United, and it took gas only from the Queen City sands. In 1950 Wilcox production was discovered in this field at depths below 6500 feet. In December, 1960, Tennessee Gas Transmission Co. started taking deliveries by a line constructed by it, and in January, 1962, Alamo Gas Supply Co. commenced taking deliveries through a line it constructed. The Tennessee and Alamo gas purchase contracts provide for prices ranging from 13¢ to 17.24¢ per mcf.

■ The royalty to be paid for gas presents a most difficult problem because of the nature of the gas sales, and has been the subject of much litigation.[1] The Courts have recognized, and the undisputed evidence in this case confirms, that the practicalities of the gas industry require that gas be sold under long-term contracts because the pipelines must have a committed source of supply sufficient to justify financing, construction and operation. Therefore, the rules of daily sales and daily quotations have no application. Foster v. Atlantic Refining Co., 5 Cir., 329 F.2d 485; Phillips Pet. Co. v. Bynum, 5 Cir., 155 F.2d 196; Gex v. Texas Co., Tex.Civ.App., 337 S.W.2d 820, no wr. hist.

■ We have been cited to no Texas case and have found none, setting forth the proper rule for determination of "market price" of gas sold under a long-term contract. The Fifth Circuit Court of Appeals in Foster v. Atlantic Refining Co., supra, recently considered the complexities presented by such a controversy and passed upon many of the points presented by this appeal. It was held in *Foster* that since the lessors were not parties to the gas sales contract, the terms of the contract did not change the lessee's obligation under the lease to pay the "market price." This obligation was fixed and unambiguous, and lessee was required to carry out same, however troublesome to ascertain or financially burdensome. This authority, al-

1. Phillips Petroleum Co. v. Ochsner, 5 Cir., 146 F.2d 138 (1944); Phillips Petroleum Co. v. Record, 5 Cir., 146 F. 2d 485 (1944); Phillips Petroleum Co. v. Johnson, 5 Cir., 155 F.2d 185 (1946); Phillips Petroleum Co. v. Bynum, 5 Cir., 155 F.2d 196 (1946), cert. denied, 329 U.S. 714, 67 S.Ct. 44, 91 L.Ed. 620; Shamrock Oil & Gas Corporation v. Coffee, 5 Cir., 140 F.2d 409 (1944), cert. denied, 323 U.S. 737, 65 S.Ct. 42, 89 L.Ed. 591; Phillips Petroleum Co. v. Williams, 5 Cir., 158 F.2d 723 (1946); Arkansas Natural Gas Co. v. Sartor, 5 Cir., 78 F.2d 924 (1935); Sartor v. United Gas Public Service Co., 5 Cir., 84 F.2d 436 (1936); Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967.

though not controlling in its interpretation of Texas law, is persuasive as being the only precedent on this point. The evidence of actual market price was not controverted in *Foster,* and that Court did not set forth a rule for determining same.

It is elemental contract law that since the lessor is not a party to the gas purchase contract entered into between lessee and a third party, he is not bound by the terms of same, if they are in conflict with lessee's obligations under the lease. However, we must not overlook the fact that gas is only sold under long-term contracts, and that a reasonably prudent operator, in the exercise of good faith, might be required to enter into such a contract. Le Cuno Oil Co. v. Smith, Tex.Civ.App., 306 S.W.2d 190, wr. ref. n. r. e.; Siefkin, Rights of Lessor and Lessee with Respect to Sale of Gas, S. W. Legal Foundation, Fourth Institute on Oil & Gas, 181–191.

In our opinion the proper rule is that the price paid under a gas purchase contract entered into between lessee and a third party is not necessarily the "market price" as provided for in the lease. However, this price, together with the circumstances of such contract, should be considered along with evidence of comparable sales to determine the market price.

The trial court found that the Nordan & Morris gas purchase contracts were entered into in good faith and there was no other market for the gas during the early years of the Lopeno Field. In 1957 the Fifth Circuit Court of Appeals upheld the validity of one of these contracts in a suit between the assignee of the Seller and the Buyer under such a contract. See Standard Oil Co. of Texas v. Lopeno Gas Co., 5 Cir., 240 F.2d 504. Appellees Vela were not parties to the Nordan & Morris gas purchase contracts. Further, they did not execute a division order authorizing payment in accordance with the contract price. Cf. Phillips Petroleum Co. v. Williams, 5 Cir., 158 F.2d 723; Summers, Oil & Gas, § 589.

Under the undisputed evidence, the 1935 contract price is substantially below the price being paid for gas during the years in controversy. The Alamo and Tennessee contracts executed in 1959–1962, called for a price from 13¢ to 17.24¢ per mcf. Appellants' witness Faucett, an officer of the corporation owning the Alamo line, testified that most contracts during this period called for a price of 12¢ per mcf, less compression costs. The president of appellant Texas Oil & Gas Corporation admitted that, unless the contract price controlled, the market price of the Vela gas was 8¢ per mcf. There is no evidence that appellants were bound to sell the Vela gas for the price asserted in the purchase contracts. The trial court did not err in entering judgment for a price in excess of the contract price under the record in this case.

All parties agree that comparable sales of gas are those comparable in time, quantity, quality, and availability of marketing outlets. Phillips Petroleum Co. v. Bynum, supra. The disagreement on this appeal is whether the appellees offered sufficient evidence within this test.

Appellees' case is based upon the testimony of their expert witness, Jack K. Baumel, whose testimony covers some 200 pages in the statement of facts. Baumel is a consultant petroleum and natural gas engineer and was formerly senior engineer of the Oil & Gas division of the Railroad Commission of Texas. He testified that he had been familiar with the Lopeno Field for many years. He had been on a retainer for a subsidiary corporation which gathered gas for the Alamo line and, in fact, testified in its behalf at a hearing before the Railroad Commission in 1963 when the Queen City sand was divided into two reservoirs. In preparation for testifying in this case, he made a study based on production of gas and sales from the Upper Queen City sand, the 2700-foot sand, and the Wilcox sand in the Lopeno Field. This study was largely based upon the State Comptroller's records of sales.

Mr. Baumel determined the amounts of gas sold from each well in the Lopeno Field during the pertinent period, and the value received for same. By division of these sums, he arrived at an "average price" received for all gas sold during this period and testified this was the "market price." In arriving at this "average price," he disregarded all gas sold under the Nordan & Morris Gas Purchase Contracts, because he said they were too far out of line. The prices on the twelve wells he considered ranged from 13¢ to 17.24¢ per mcf, and the average price was 16.047¢ per mcf. Since the gas from the Upper Queen City sand was of low pressure, he deducted a compression charge of 3¢ per mcf, and testified that 13.047¢ per mcf was the market price of the Vela gas.

Appellants urge that this testimony is without weight in that the Tennessee and Alamo contracts involve vastly different factors and circumstances and do not meet the comparable test requirements. The Lopeno Field wells which are under contract to either Tennessee or Alamo, are part of "package deals" involving large gas reserves. The Tennessee contracts are under regulation of the Federal Power Commission, and Alamo involves a long-term contract with the City of San Antonio. The dedicated reserves of each amount to nearly 300 billion cubic feet. Nearly all the wells used in determining the "average price" are producers from the Wilcox formation, which produces a high pressure gas of sufficient pressure to enter a 1000-pound line without compression. Appellants point out that Baumel made no study of the Wilcox wells and the Queen City wells from the standpoint of quality of the gas. They urge that, in any event, there is no evidence of demand for the Vela gas at this price, since there is evidence Tennessee did not want it, and Alamo would only take Vela gas at a price of 10¢ per mcf.

These differences were fully developed by appellants in their cross-examination of Baumel. He testified that although the Queen City sands are two-thirds depleted, there still remain estimated reserves of 50 to 60 billion cubic feet of gas, and this is sufficient to justify a market. He denied there is any difference in the quality of the Queen City and Wilcox gas, and that after allowing 3¢ for the expense of compression, the difference in pressure is immaterial. The record shows that appellants' gas is committed to a contract with Central Power & Light Co., at Laredo, and the terms of this contract with appellants' subsidiary corporation were not introduced in evidence.

■ The trial court did not err in considering the sales under the Tennessee and Alamo contracts. Few, if any, sales will be based upon identical facts. As long as the sales are substantially the same in time, quantity, quality and availability of marketing outlets and the differences are shown, they are admissible. The testimony of Baumel met this test.

The "average price" method used by Baumel in determining "market price" can not be the final answer to the difficult problem of determining market price of gas despite its simple application. For example, in this field it would lead to the result that none of the lessees of the twelve wells considered by Baumel are paying the market price. Royalty from all but three is in excess of this price. Further, if the technique of disregarding the prices paid under the contract then under consideration is followed,[2] this would result in a different "average price" for each contract in the field. However, Baumel's average price of 13.047¢ was corroborated, in that sales from two Upper Queen City wells were based on prices of 14.078¢ and 13.00¢. It was his testimony that these prices were net and included all gathering and compression charges.

To contradict this evidence, testimony was offered by appellants as to the prices

2. Phillips Petroleum Co. v. Bynum, 5 Cir., 155 F.2d 196 (1946).

paid for gas from Queen City wells in Zapata and Starr Counties located in fields near the Lopeno Field. The production from the sixteen wells so considered was sold at prices ranging from 6.75¢ per mcf to 12¢ per mcf, with an average price of 9.44¢ per mcf.

It is our opinion that the testimony of Baumel, when weighed under the no evidence test, is evidence more than a scintilla that the market price of the Vela gas during the pertinent period was 13.047¢ per mcf. Furthermore, after an examination of the entire record, it is seen that although the market price of this gas is near the maximum price paid for any Queen City sand production, it is within the range of comparable sales during the pertinent period. Therefore, we cannot say that the trial court abused its discretion, as the trier of facts in this case, in finding the market price of 13.047¢ per mcf.

Appellants urge that appellees ratified the acts of appellants in selling the gas under the gas purchase contracts by accepting and retaining without complaint their royalties paid for many years on that basis. A similar contention, insofar as appellees Vela are concerned, was rejected in Foster v. Atlantic Refining Co., supra. The reasons given for this holding are valid and are applicable to the appellees Vela. Appellees Vela did not ratify the act of appellants in selling the royalty gas for less than the prevailing market price by accepting the sums paid by appellants.

A more difficult question is presented as to appellees Nordan and Mrs. Gaines. Nordan & Morris entered into the Gas Purchase Contracts as Buyers with lessees, under the terms of which the Vela gas had been purchased for 2.3¢ per mcf. Portions of the Vela lease premises were formerly owned by the American Texas Oil Co., which entered into a gas purchase contract with Nordan & Morris dated January 17, 1935. In 1941, this corporation was dissolved and the properties were conveyed to the individual stockholders in proportion to their interests. Such conveyances are shown by assignments executed by appellee Nordan as surviving President and Director of the Company, and by Mrs. John G. Morris (now appellee Hannah D. Gaines) as surviving Director and as Liquidating Trustee thereof. All assignments expressly ratified and confirmed the gas purchase contract.

Mrs. Gaines thereby received a 25% interest in the American-Texas Group. By virtue of these circumstances, Mrs. Gaines is placed in the position of being both plaintiff and defendant and of taking a judgment against herself. Nordan Company, composed in part of the children of L. A. Nordan, received a 25% interest. Mr. Nordan, although not shown to own any interest in Nordan Company, apparently remained in an executive capacity with same, in that all correspondence to this company is addressed to him. Nordan & Morris retained the rights of Buyer under the gas purchase contracts with the lease operators until the year 1950, when they sold their rights thereunder to Joe C. Palmer. These rights were subsequently acquired by Delhi-Taylor Pipeline Corp. in 1963.

Neither Nordan nor Mrs. Gaines indicated any dissatisfaction with the royalty being paid under the terms of the gas purchase contract made by them or their predecessors in title, until their intervention on August 28, 1964. They are equitably estopped from tying the hands of the lease operators by entering into a contract with them and committing all gas produced from the lease premises to be sold for 2.3¢ per mcf, and then, after accepting the benefits of this contract, turning around and claiming as non-participating royalty owners that they are entitled to be paid on the basis of 13.047¢ per mcf. Theriot v. Smith, Tex. Civ.App., 263 S.W.2d 181; 31 C.J.S. Estoppel § 108; 22 Tex.Jur.2d, Estoppel, § 11.

The trial court erred in entering judgment for appellees Nordan and Mrs. Gaines for any sums accruing prior to their com-

plaint to appellants of their payment for gas in accordance with the original purchase contracts. Appellants' points complaining of lack of pleadings and evidence to support a judgment for appellees Nordan and Mrs. Gaines are therefore immaterial and will not be discussed.

The trial court properly awarded appellees Vela judgment for the difference between the royalties paid for the gas sold and the amount owed when the royalties are computed under the "market price," together with interest on said sum from their respective dates of sale. Appellees concede that the four-year statute of limitations applies to this claim. Appellees Vela, as well as appellees Nordan and Mrs. Gaines, have filed a remittitur in this Court, in which they agree that appellant Delhi-Taylor's points that the judgment includes some items barred by limitations are well taken. The judgment must be reformed to reflect this remittitur filed by appellees Vela.

Insofar as the judgment against the American-Texas group is concerned, complaint is made that the judgment is taken against all parties jointly and severally, whereas each of the parties thereto owns an undivided interest in the leasehold interest formerly owned by the American-Texas Oil Company. These interests vary from the 25% interest owned by Mrs. Gaines and Nordan & Company, to a 5% interest owned by C. A. Reiter. Appellants urge that the judgment against these parties should be taken severally in accordance with the interest of each.

Appellees say the judgment is proper, in that the parties operated as a mining partnership. There were no pleadings of a mining partnership and no finding of same by the trial court. The record does not establish a mining partnership as a matter of law. The record shows only that the parties had a joint ownership of this leasehold interest. There are no facts in the record to show how the leasehold was operated.

In Rucks v. Burch, 138 Tex. 79, 156 S.W.2d 975 (1941), the applicable rule is set forth: "It is settled as a law of this State that in order to constitute a mining partnership arising by operation of law there must not be only joint interest in the mining property but joint operation thereof as well. Joint ownership without joint operation merely constitutes cotenancy. To constitute a mining partnership it is essential that there be an actual working of the mine by the partnership." See also Templeton v. Wolverton, 142 Tex. 422, 179 S.W. 2d 252 (1944). The judgment insofar as the American-Texas Group is concerned must be reformed to provide for several liability of each of the parties thereto in accordance with the respective interest of each during the pertinent period.

Appellees Vela prayed for and were granted a declaratory judgment that all gas taken would be paid for at the prevailing market price rather than at the contract price. An adjudication was not sought or granted as to what value would be paid for the gas. This declaration was proper in view of what has been heretofore said relative to "market price." The trial court improperly granted said adjudication from date of filing of suit in lieu of date of judgment, in that there is no evidence as to market price of gas between February, 1964, when suit was filed, and November, 1965, the date of judgment. All such evidence was kept out by repeated objections of appellees Vela. This declaratory judgment must be reformed to provide that appellees shall be paid by appellants for all gas sold after date of judgment at the prevailing market price.

The Queen City formation in the Lopeno Field consists of a series of sands located at depths from approximately 2,000 to 2,700 feet. Prior to December, 1963, all of these sands were treated and produced as one reservoir. At this time the Railroad Commission on application of appellant Texas Oil & Gas Corp., established as separate reservoirs the Upper Queen City sand, en-

countered at depths of 2,025 to 2,510 feet, and the Queen City 2,700-foot sand encountered at depths of 2680 to 2753 feet. It is undisputed that there are 524.5 productive acres of 2,700-foot sand underlying the Vela leasehold, containing substantial gas reserves. Three wells have been drilled and completed in this sand, although two were plugged by Texas Oil & Gas Corp. in 1963. The other, owned by appellant Texas Oil & Gas Corp., the Lopeno 19, is a direct offset to the Vela acreage, and it is undisputed that drainage has occurred in the 2,700-foot sand from beneath the Vela lands.

In their second amended petition filed on February 12, 1965, appellees sought to recover damages for drainage of the 2,700-foot sand under the leasehold premises, and further sought a conditional decree requiring appellants to develop and produce these sands to their full extent, or that the lease be cancelled as to all depths below present producing sands. The trial court denied any recovery of damages based on drainage because of appellees' failure to give written notice of such breach, as provided by the terms of said lease. It found, however, that a reasonably prudent operator would have drilled and completed protection wells on appellees' lands in this known producing reservoir. A conditional decree was entered requiring appellant Texas Oil & Gas Corp. to protect appellees' lands from future drainage, and for reasonable development to drill two wells in accordance with certain timetables set forth in the judgment. In the event of appellants' failure to perform or obey these conditions within 150 days from date of judgment, it was provided that the lease would be cancelled and terminated as to all depths beneath the Upper Queen City sand. Appellees concede that this judgment should be reformed to provide for cancellation beneath the Queen City sands and above 4,000 feet, in that these appellants do not own below this depth.

The lessee in an oil and gas lease assumes a number of implied obligations to the lessor with reference to the operation and development of the leasehold premises, in the absence of express provisions relieving the lessee of these obligations, including the covenants to develop the premises with reasonable diligence and to protect the premises against drainage by using reasonable diligence in drilling offset wells. Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 79 A.L.R.2d 774 (1964); Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27 (1929); Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.2d 1031, 60 A.L.R. 936 (1928); Walker, Property Interests Created by Lease, 11 Tex. Law Rev. 399.

Appellants urge that there has been no drainage in that the two reservoirs have been in communication with each other, and that the gas from one reservoir can migrate to the other reservoir by means of an open well completion. This was denied by appellees' witness Baumel, and his testimony was corroborated by the physical fact the the pressures in the two reservoirs are different. Baumel testified that appellees had been damaged by drainage up to the time of trial in the amount of $8,797.94.

Appellants complain of the relief granted appellees for this breach of lessee's implied covenants to properly develop the 2,700-foot sand and to protect lessor from drainage. By cross-point, appellees complain of the trial court's denying them any recovery of damages for past drainage. The lease contains a clause which provides, in essence, that as a condition precedent to any action lessor is required to notify lessee in writing, setting out specifically in what respects lessee had not complied with its express and implied obligations, and that no suit shall be brought until the lapse of sixty days after such notice. There was evidence of numerous complaints of failure to protect against drainage from the Upper Queen City sands, but the first complaint as to the 2,700-foot sand was made in the amended petition which was filed in February, 1965.

■ The trial court properly denied recovery for the drainage which occurred prior to this complaint as required under the express terms of the lease. Kinnear v. Scurlock Oil Co., Tex.Civ.App., 334 S.W.2d 521, wr. ref. n. r. e.; Andretta v. West, Tex.Civ.App., 318 S.W.2d 768, wr. ref. n. r. e.; Burnett v. R. Lacy, Inc., Tex.Civ.App., 293 S.W.2d 674, wr. ref. n. r. e. See also, Billeaud Planters, Inc. v. Union Oil Co. of California, 245 F.2d 14 (5th Cir.). In General Crude Oil Co. v. Harris, Tex.Civ.App., 101 S.W.2d 1098, wr. dism., which was an opinion by the same Court which later decided *Andretta* and *Burnett*, it is said that failure to give notice in accordance with the terms of the lease applies only to suits for cancellation and does not apply to suits for damages. It is seen, however, that the Court further found that the notice given by lessors to lessee was a substantial compliance with the provisions in the lease for notice, except that it was not in writing.

Under the clear and unambiguous terms of the lease, appellees were required as a prerequisite to the recovery for breach of implied covenants "to notify lessee in writing, setting out specifically in what respects lessee has breached this contract." The trial court found that they did not give this notice and denied recovery of damages. Appellees' cross-point is overruled.

The trial court found that appellees should be protected from future drainage and failure to develop the 2,700-foot sand reservoir, and entered a conditional decree requiring appellants to drill an offset well to the Lopeno No. 19, which was draining the Vela leasehold, and an additional well within the limits of this reservoir. Appellants urge the trial court erred in entering this conditional decree in that appellees may be adequately compensated by an award of damages.

■ The landmark case of Waggoner Estate v. Sigler Oil Co., supra, established the applicable rule: "The usual remedy for breach of the lessee's implied covenant for reasonable development of oil and gas is an action for damages, though, under extraordinary circumstances—where there can be no other adequate relief—a court of equity will entertain an action to cancel the lease in whole or in part." This holding has been consistently followed by the courts of this State. See Henshaw v. Texas Natural Resources Foundation, 147 Tex. 436, 216 S.W.2d 566 (1949); Christie, Mitchell & Mitchell Co. v. Howell, Tex.Civ.App., 359 S.W.2d 658, wr. ref. n. r. e.; Ft. Worth Nat. Bank v. McLean, Tex.Civ.App., 245 S.W.2d 309, wr. ref. n. r. e.; Hart, Damages & Relief for Breach of Covenants, S.W. Legal Foundation, Seventh Oil & Gas Inst., 47; Brown, Implied Covenants, 13 S.W.L.J. 151, 171.

In Perkins v. Mitchell, 153 Tex. 368, 268 S.W.2d 907 (1954), the Supreme Court affirmed a judgment providing that a well be drilled within ninety days, with termination of the lease for failure to so perform. The jury there found that damages were impossible of ascertainment and no complaint was made of this finding. The opinion of the Supreme Court is largely devoted to the question of the uncertainty of the jury's answers and the applicability of this type of relief is not considered.

■ The pleadings of appellees sought by alternative counts to recover either a conditional decree or damages of compensatory royalty for appellants' breach of their implied covenants to prevent drainage and to develop. There was no finding by the trial court that damages could not be ascertained and we cannot say that such a finding is established as a matter of law. Very little gas is now being taken from the 2,700-foot sand in that appellants are apparently able to supply all the demand for their gas from the Upper Queen City sand, including their wells on the Vela leasehold. This record does not demonstrate "extraordinary circumstances" as a matter of law to justify the court to enter the conditional decree in lieu of damages. Since there is no finding of the amount of damages, the cause must be remanded to the trial court for determination of this sum.

Appellant Delhi-Taylor Corp. has filed a separate brief and, in addition to joining in the errors asserted by the other appellants, urges that the trial court erred in denying a jury trial although a request, together with the jury fee, was filed on April 2, before the April 12, 1965, trial, by the attorneys then representing the Jamison Estate interest (assignees of 22½% of the interest formerly owned by American Texas Oil Co.). This interest was acquired by appellant Texas Oil & Gas Corp., shortly before the case proceeded to trial, and its attorneys represented the Jamison Estate interest at the trial. Texas Oil & Gas Corp. expressly waived a jury.

A pre-trial hearing was had on April 9, 1965, and at the conclusion of that hearing an order was entered denying the Jamison Estate request for a jury. The trial court found the parties composing the Jamison Estate interest had waived their right to a jury trial, and, further, that their application for a jury was not timely filed in accordance with Rule 216, Texas Rules of Civil Procedure, since it was not filed on appearence day, or a reasonable time thereafter, before the date set for trial. The attorney representing Delhi-Taylor was not present at this pre-trial hearing although duly notified of same. On April 12, 1965, the case was called for trial pursuant to the agreed setting made on February 23, 1965, and at this time Delhi-Taylor's attorney announced that it was ready for trial, but did not waive the request for jury.

On February 23, 1965, this case was regularly called for trial. A jury was available at that time. A motion for continuance was filed by the Jamison Estate interests and after a full discussion, all parties present agreed to a postponement of the case until a special setting on April 12 and 13, 1965. The trial court found that all parties present agreed to this setting at a special two-day non-jury term of the court. Delhi-Taylor's attorney admitted agreeing to the date, but could not recall agreeing to a non-jury trial. All other attorneys, including the attorney for Texas Oil & Gas Corp., recalled such an agreement. The jury for the term was then discharged and none was available on April 12. The attorney representing the Jamison Estate interests was not present at the February 23rd hearing, but the attorney representing Texas Oil & Gas Corp., announced that it was in the process of acquiring the Jamison Estate interests. The trial court further found in its order of April 9, that a jury was unavailable on the 12th, and that to grant a jury trial would interfere with and impede the handling of the court's heavy docket, and would delay the case at least until the September term of court.

The Constitution of Texas guarantees that "[t]he right of trial by jury shall remain inviolate," and grants to all litigants the right to a jury trial in suits of an equitable nature. Art. 1, § 15. However, a litigant must take affirmative action to avoid a waiver of his right to a jury trial. Art. 5, § 10, Vernon's Ann.Tex. Const. Rule 216, T.R.C.P., provides the instructions for timely demand of a jury. This rule allows the demand, if not made on or before appearance day, to be made "a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than ten days in advance." We have found no case directly in point, however, the language of this rule clearly indicates that a demand made ten days or more in advance of the trial is not necessarily within a reasonable time. McDonald, Texas Civil Practice, § 11.03.

It is seen that the jury for the term was discharged after the agreement to the non-jury trial. The trial court found that it would delay the trial until the September term in order to secure a jury after the demand was made. The 49th Judicial District is composed of three counties in addition to Zapata, and has a heavy trial docket. It is our opinion that these facts support the trial court's conclusion that

the demand was not made a reasonable time in advance of the setting. In any event, Delhi-Taylor waived its right to a jury trial at the hearing on February 23, 1965, and cannot now complain.

The judgment of the trial court is affirmed, insofar as appellees Juan M. Vela, Ernestina Vela, Carlos Vela and Emma Vela de Garcia, jointly, recover of and from Texas Oil & Gas Corp. for royalties due and unpaid; their judgment against Delhi-Taylor Oil Corporation for royalties due and unpaid is reformed to provide that they shall recover jointly the sum of $2,853.14; their judgment against the American-Texas Group is reformed to provide that plaintiffs recover judgment severally against Hannah D. Gaines for 25%; Nordan & Company for 25%; Mrs. Leo G. Moss for 22½%; C. T. Jamison Estate for 22½%, and C. A. Reiter for 5% of the sum of $12,684 owed for royalties due and unpaid.

The declaratory judgment is reformed to provide that all royalties paid from date of final judgment shall be paid for on the basis of the market price.

The conditional decree provisions of the judgment are reversed, and appellees' claim for protection for future drainage and proper development is severed, and remanded for determination of the amount of damages for breach of these implied covenants by Texas Oil & Gas Corp.

Cross-appellees L. A. Nordan and Hannah D. Gaines' judgment against appellants Delhi-Taylor Oil Corporation, the American-Texas Group, and Texas Oil and Gas Corp., is reversed and here rendered that said parties take nothing.

The costs of this appeal are taxed one-third against appellees Vela et al., one-third against appellees Nordan and Gaines, jointly, and one-third against appellants Texas Oil & Gas Corp., Delhi-Taylor Oil Corp., and the five parties comprising the American-Texas Group.