**TEXAS OIL & GAS CORPORATION et al.,
Petitioners-Respondents,**

v.

**Juan M. VELA et al., Respondents-
Petitioners.**

No. A–11666.

Supreme Court of Texas.

April 3, 1968.

On Rehearing July 2, 1968.

Rehearing Denied July 24, 1968.

Geary, Brice & Lewis, W. S. Barron, Jr., Dallas, G. C. Mann, Laredo, Robert R. Barton, Kerrville, for Texas Oil and Gas Corp. and others.

Meer, Chandler & Carlton, Dean Carlton, Dallas, for Delhi-Taylor Oil Corp.

Turner, Hitchins, McInerney, Webb & Hartnett, James J. Hartnett, Dallas, for Texas Oil and Gas and Delhi-Taylor.

Fansler & Fansler, C. N. Fansler, Jr., Laredo, for Hannah D. Gaines et vir.

Mann, Cronfel & Mann, John E. Mann, Laredo, Bobbitt, Brite, Bobbitt & Allen, Robert Lee Bobbitt, Jr., San Antonio, for Juan M. Vela and others.

W. Pat Camp, San Antonio, for L. A. Nordan.

WALKER, Justice.

This case involves an oil and gas lease executed in 1933 and covering 1,500 acres of land in Zapata County. Under its terms the lessee is obligated to "pay to lessor, as royalty for gas from each well where gas only is found, while the same is being sold or used off of the premises, one-eighth of the market price at the wells of the amount so sold or used." Gas has been produced and sold from the leased premises since 1935. In that year the owners of the working interest entered into contracts "for the life of the lease" by the terms of which the gas was sold at a price of 2.3¢ per mcf. Royalties have been paid on that basis, but more recent contracts for the sale of gas from the same field provide for substantially higher prices.

Subject to certain non-participating royalty interests, the title of the original lessors is owned by Juan M. Vela et al, hereinafter referred to as the Velas. They instituted suit to recover alleged deficiencies in royalty payments on gas sold from the leased premises during the period from February 1, 1960, to January 31, 1964, and for additional relief on the theory that the premises were being drained and had not been properly developed. The principal defendants, who will be referred to individually by name and collectively as re-

spondents, are Delhi-Taylor Oil Corporation, the American-Texas Group, and Texas Oil & Gas Corporation. These respondents were owners of the working interest at different times during the four-year period. One member of the American-Texas Group is Mrs. Hannah D. Gaines, who owns a three-sixteenths non-participating royalty interest in the land. The named defendants also include L. A. Nordan, who owns a one-fourth non-participating royalty interest. Nordan and Mrs. Gaines, who will be referred to by name or as petitioners, answered and sought a recovery of any additional royalties to which they might be entitled. They and the Velas compromised and settled their claims against several defendants referred to as the Venture Group. Under and in accordance with the terms of the settlement agreement, judgment was rendered against the Venture Group for deficiencies in royalty payments with the understanding that no execution would issue thereon.

After a non-jury trial the district court rendered judgment: (1) awarding the Velas, Nordan and Mrs. Gaines a total of $55,750.13 for unpaid royalties and interest; (2) denying a recovery of damages for past drainage; (3) declaring that the working interest operators are obligated to pay as royalty one-eighth of the market price at the wells, at the time produced, of all gas sold or used off the premises after February 1, 1964; and (4) directing Texas Oil & Gas Corporation, the present owner of the working interest, to drill certain additional wells or suffer cancellation of the lease. The Court of Civil Appeals: (a) affirmed the money award in favor of the Velas but modified the judgment of the trial court to provide that the recovery against the members of the American-Texas Group should be several and not joint; (b) upheld the denial of damages for past drainage; (c) reversed and rendered judgment that Nordan and Mrs. Gaines take nothing by their suit for additional royalties; (d) modified the declaratory portion of the judgment to provide

that the operators would be obligated to pay royalties on the basis of market price from and after the date of judgment; and (e) held that the royalty owners could be adequately compensated by an award of damages for drainage and failure to develop after the operator was notified of its failure to comply with the implied covenants of the lease. The judgment of the trial court, in so far as it directed Texas Oil & Gas Corporation to drill additional wells or suffer cancellation of the lease, was accordingly reversed, and that part of the case was severed and remanded to the district court for a determination of the amount of damages. 405 S.W.2d 68.

Applications for writs of error were filed by the Velas, Nordan, Mrs. Gaines, Delhi-Taylor, the American-Texas Group, and Texas Oil & Gas Corporation. All applications were granted, and the case was argued orally and submitted to the Court for decision. Some time after argument a joint motion was filed by the Velas, Texas Oil & Gas Corporation. Delhi-Taylor and the American-Texas Group stating that all claims and controversies between them have been settled and praying that the cause be dismissed as moot but without prejudice to the claims of Nordan and Mrs. Gaines against Texas Oil & Gas Corporation, the American-Texas Group and Delhi-Taylor. This motion is granted as hereinafter set out, but there are a number of questions to be decided in disposing of the claims of Nordan and Mrs. Gaines.

As indicated above, Nordan and Mrs. Gaines each own a fractional non-participating royalty interest. Their pleadings indicate that they would have been content if the claims of the Velas had been denied, but in the alternative they adopted the Velas' first amended original petition and prayed that they be given their portion of any relief granted by the court. In a later pleading they alleged their royalty ownership more specifically and prayed that they recover damages from Texas Oil and Gas Corporation and certain other

defendants in proportion to any amount awarded the Velas on the basis of their second amended original petition. As we construe the pleadings and in so far as they affect the questions to be decided here, Nordan and Mrs. Gaines were seeking in the trial court substantially the same relief as the Velas. They brought forward a number of points of error to the Court of Civil Appeals and also adopted the brief filed there by the Velas.

Although the Court of Civil Appeals upheld the award of additional royalty to the Velas, it concluded that Nordan and Mrs. Gaines are equitably estopped from asserting their right to a similar recovery. This question will be discussed later. Respondents make two other basic contentions with respect to the action for the recovery of additional royalty: (1) that the contract price of 2.3¢ per mcf at which they sold the gas is the market price within the meaning of the lease; and (2) that even if this is not so, there is no evidence to support the trial court's finding that the market price of the gas during the four-year period was 13.047¢ per mcf. These contentions will be considered in the order in which they have been stated.

The leased premises are located in the Lopeno Field, which was discovered in 1934. The first gas well on the land was brought in shortly after that time, and six wells have now been completed thereon. These wells produce from the Upper Queen City sand. Another and lower Queen City sand located at a depth of about 2,700 feet was recognized in 1963 as a separate reservoir from the upper Queen City. There was no pipeline in the Lopeno Field and no market for the gas when it was first discovered. Nordan & Morris, a partnership composed of L. A. Nordan and John G. Morris, acquired various leases in the field. They entered into a gas sales contract with United Gas Public Service Company on November 20, 1934. Under its terms Nordan & Morris agreed to establish the commercial possibilities of the field by completing at least three gas wells

capable of delivering a combined total of five million cubic feet of gas daily. United agreed to construct a pipeline to the field and was granted the exclusive right to purchase on a ratable basis all gas produced from land in the field in which Nordan & Morris owned or acquired an interest. This right was to exist for the terms of the leaseholds and any renewals or extensions thereof. The stipulated price was 3½¢ per mcf, computed at a base pressure of two pounds per square inch above an assumed atmospheric pressure of 14.4 pounds per square inch.[1]

Nordan & Morris then entered into gas purchase contracts with various operators in the field. All owners of the working interest in the lease now in question executed such contracts, agreeing to sell the gas produced from the leased premises in accordance with their terms. There are three of these contracts, two of which were executed in 1935 and the third in 1937. They provide for an effective rate of 2.3¢ per mcf at standard measurement, and for a term during the life of the leases covered thereby. All of the contracts were consummated, and all gas sold from the leased premises as well as from the surrounding land has been marketed pursuant to their terms.

The only producing formations in the Lopeno Field from the time of its discovery until 1960 were the Queen City sands. In 1950 Wilcox production was discovered in the area, the Wilcox formation being a deep sand found at depths below 6,500 feet. Additional pipelines were then built into the area, and there are now three companies purchasing gas from the Lopeno Field. They are Delhi Gas Pipeline Corporation, the successor to United, Tennessee Gas Transmission Company, and Alamo Gas Supply Company. The net prices paid by the last two companies range from 13¢ to 17.24¢ per mcf.

When the Nordan & Morris contracts were made, however, United was the only commercial purchaser of gas in the field. The operators could market their gas only on a "life of the lease" basis, and the price stipulated is the only price that could be obtained at that time. Respondents also point out that gas is not sold on a day-to-day basis, and that any substantial volume can be marketed only under a long-term contract that fixes the price to be paid throughout its term. The trial court found that the contracts in this case were made in good faith, and the finding has not been attacked. Petitioners argue that in these circumstances, the market price of gas within the meaning of the lease is the price contracted for in good faith by the lessee in pursuance of its duty to market gas from the premises. We do not agree.

■ Mrs. Gaines may well have been obligated to sell gas in accordance with the terms of the contracts while she owned part of the working interest,[2] but none of the royalty owners has ever agreed to accept royalties on the basis of the price stipulated in the contracts. The royalties to which they are entitled must be determined from the provisions of the oil and gas lease, which was executed prior to and is wholly independent of the gas sales contracts. In addition to the gas royalty clause quoted above, the lease binds the lessee:

"1st. To deliver to the credit of lessor, free of cost, in the pipe line to which lessee may connect its or his wells, the equal one-eighth part of all oil produced and saved from the leased premises.

\* \* \* \* \* \*

"3rd. To pay to lessor as royalty for gas produced from any oil well and used by lessee for the manufacture of gasoline, one-eighth of the market value of

1. The contract with United was made prior to the enactment of the Standard Gas Measurement Law, Article 6066b, Vernon's Ann.Tex.Civ.Stat.

2. See Standard Oil Co. of Texas v. Lopeno Gas Co., 5th Cir., 240 F.2d 504.

such gas. If such gas is sold by lessee, then lessee agrees to pay lessor, as royalty, one-eighth of the net proceeds derived from the sale of said casinghead gas at the wells."

It is clear then that the parties knew how to and did provide for royalties payable in kind, based upon market price or market value, and based upon the proceeds derived by the lessee from the sale of gas. They might have agreed that the royalty on gas produced from a gas well would be a fractional part of the amount realized by the lessee from its sale. Instead of doing so, however, they stipulated in plain terms that the lessee would pay one-eighth of the market price at the well of all gas sold or used off the premises. This clearly means the prevailing market price at the time of the sale or use. The gas which was marketed under the long-term contracts in this case was not "being sold" at the time the contracts were made but at the time of the delivery to the purchaser. See Martin v. Amis, Tex.Com.App., 288 S.W. 431, 433. We agree with the Court of Civil Appeals, therefore, that the contract price for which the gas was sold by the lessee is not necessarily the market price within the meaning of the lease. See Foster v. Atlantic Refining Co., 5th Cir., 329 F.2d 485; Wall v. United Gas Public Service Co., 178 La. 908, 152 So. 561.

The lease obligation may prove financially burdensome to a lessee who has made a long-term contract without protecting itself against increases in market price. This was considered in *Foster,* where the court said:

"The inability of Atlantic to make a gas sales contract with escalation provisions is beside the point. The obligation of Atlantic to pay royalties is fixed and unambiguous. It made the gas sales contract with full knowledge of this obligation and did nothing to protect itself against increases in price. The fact that its purchaser would not agree to pay the market price prevailing at the time of the delivery does not destroy the lease obligation.

\*　\*　\*　\*　\*　\*

"When it made the gas sales contract, Atlantic took the calculated risk of that contract producing royalties satisfactory to the lease terms. The fact that increases in market prices have made the lease obligations financially burdensome is no defense.

\*　\*　\*　\*　\*　\*

"Atlantic argues that it is only required to use reasonable diligence in selling the Foster royalty gas and that the 1950 contract was not improvident. These arguments beg the question. The royalty provision is clear. Granting that the 1950 contract was provident when made, that fact does not change the royalty provisions.

"Stripped of all the trimmings Atlantic's position is simply: We cannot comply. This is no answer. The lease calls for royalty based on the market price prevailing for the field where produced when run. The fact that the acertainment of future market price may be troublesome or that the royalty provisions are improvident and result in a financial loss to Atlantic 'is not a web of the Court's weaving.' Atlantic cannot expect the court to rewrite the lease to Atlantic's satisfaction."

We are in general agreement with these conclusions and turn now to respondents' second basic contention. As indicated above, the trial court found that the market price of the gas during the four-year period was 13.047¢ per mcf. This finding, if it has any support in the evidence, must rest upon the testimony of Mr. Jack K. Baumel. Our statement concerning the witness and his testimony is taken largely from the opinion of the Court of Civil Appeals. Baumel is a consultant petroleum and natural gas engineer who had been employed by the Railroad Commission of Texas and by other governmental agencies. He had

been familiar with the Lopeno Field for for many years, and before testifying in this case he made a study of production and sales of gas from the field. The records of sales in the office of the Comptroller of Public Accounts were the principal source of his information, but he also considered the gas sales contracts made by the various producers in the field.

Mr. Baumel ascertained the amounts of gas sold from each well in the field during the four-year period and the amount received for the same. This included production from the Upper Queen City sand, the 2,700-foot Queen City sand, and the Wilcox sand. By mathematical calculation he determined that the average price received for all gas sold during the period, except that marketed under the Nordan & Morris contracts, was 16.047¢ per mcf. He stated that the amounts received pursuant to the Nordan & Morris contracts were disregarded because such contracts were too far out of line. Since the gas from the Upper Queen City sand was of low pressure, he deducted a compression charge of 3¢ per mcf from the average price, and testified that 13.047¢ per mcf was the market price of the Vela gas.

■ The parties agree that the market price of gas is to be determined by sales of gas comparable in time, quality and availability to marketing outlets. See Phillips Petroleum Co. v. Bynum, 5th Cir., 155 F.2d 196. Respondents contend, however, that Baumel's conclusion as to market price is nothing more than the mathematical average of the amounts received from noncomparable sales involving vastly different factors and circumstances. They also say that there is no demand whatever for the Vela gas at the price found by the trial court.

We have already pointed out that all wells on the leased premises produce only from the upper Queen City sand. The prices used by Baumel in making his calculations are those paid by Tennessee and Alamo under their contracts with various producers. These contracts were made in 1960 and 1961 before the lines of the particular company were laid into the field. They cover some Queen City gas, but most of the wells produce from the Wilcox formation. The estimated reserves committed thereunder to each company amount to approximately 300 billion cubic feet of gas, and the Alamo contract covers 14 different fields located in five counties. The latter contract was made to enable Alamo to fulfill another contract in which it agreed to supply the public consumer gas requirements of the City of San Antonio for a period of twenty years. Tennessee has five contracts which were presented as a package to the Federal Power Commission, apparently in connection with an application for authorization to extend its pipeline to the Lopeno Field.

The Queen City sands in the Lopeno Field are about two-thirds depleted and have remaining reserves of from 50 to 60 billion cubic feet of gas. The original flowing pressure of wells producing therefrom was approximately 1,000 pounds per square inch, but the same has now fallen to an estimated range of from 150 to 200 pounds. Wilcox gas is of sufficient pressure to enter a 1,000 pound line without compression. It also appears that Queen City gas is extremely dry and that Wilcox gas has some distillate in it.

As pointed out by the Court of Civil Appeals, these differences were fully developed by petitioners in their cross-examination of Baumel. He recognized that the market price of gas might be affected by the type and quality of the gas, pressure, reserves and deliverability. The witness stated, however, that reserves are not a significant factor when pipelines have already been laid into the field, and that the remaining Queen City reserves are sufficient to justify a market. He further testified that there is no substantial difference between the Queen City gas and that produced from the Wilcox formation, and that the deliverability of the Vela wells is better than average for the field. Queen

City gas and Wilcox gas are intermixed by the purchasers in their pipelines, and the "end use" of gas produced from each source is the same. The witness also stated that after an allowance of 3¢ per mcf was made for compression charges, the pressure differential is not material. There is no contention that the amount allowed as a compression charge is not reasonable.

Baumel had not tested the BTU content of the Wilcox gas. He reasoned that Wilcox gas and Queen City gas are of similar type and quality because they were mixed by purchasers in the same pipeline and devoted to the same ultimate use. We do not attempt to determine whether his conclusion in that respect is entirely valid, because it appears that since 1960 at least 10 additional wells have been drilled to the Queen City sands. These were dedicated by the producers under amendments to the existing contracts at net prices ranging from 13.047¢ to 14.24¢ per mcf. In the light of such facts and the other circumstances mentioned above, the trial court was not required as a matter of law to reject Baumel's opinion that there is no substantial difference in the quality or market value of Queen City and Wilcox gas.

■ We agree with the Court of Civil Appeals that the mathematical average of all prices paid in the field is not a final answer to the difficult problem of determining market price at any particular time. But see Wall v. United Gas Public Service Co., supra, and Arkansas Natural Gas Co. v. Sartor, 5th Cir., 78 F.2d 924. In this instance, however, both the witness and the trial court were required to fix a figure that would be used in determining the amount that should have been paid to the royalty owners over a period of four years. If the rate of production were constant, that figure would be the average market price for the period. Baumel's conclusion as to the market price of the gas in question is corroborated, moreover, by the sales of Queen City gas under amendments to the existing contracts. As for respondents' contention that there is no demand for

Queen City gas at the price found by the trial court, it does not appear that any well in the field is shut in for lack of a market. In these circumstances and where purchasers have amended their contracts to cover additional Queen City wells at equal or greater prices, it may fairly be inferred that there was a demand for the Vela gas at 13.047¢ per mcf.

Respondents rely upon Phillips Petroleum Co. v. Bynum, supra; Arkansas Natural Gas Co. v. Sartor, supra; Shamrock Oil & Gas Corp. v. Coffee, 5th Cir., 140 F.2d 409; and Sartor v. United Gas Public Service Co., 186 La. 555, 173 So. 103. These cases are to be distinguished on the facts. The gas involved in *Bynum* was used for the extraction of gasoline and other products. There was no market for the same from companies which dealt in gas for heating and fuel, and it was held that the amounts paid by such companies was not competent evidence of market price. Certain contracts were held inadmissible in *Arkansas Natural Gas,* because the undisputed testimony showed that the guaranty to deliver large quantities of gas from another field constituted part of the consideration for the price paid and there was no evidence that would enable the jury to determine what this amounted to. The court went on to say, however, that:

"It is also apparent that the stipulation as to average prices paid under contracts substantially similar to the lease in suit was improperly excluded. The same is true in respect to the testimony of Hargrove wherein his opinion as to the established market price at the well and the prices paid in other sales, under substantially similar conditions, was sought to be elicited."

■ In *Coffee* it was held that market price is to be determined by comparable sales and not by the opinions of witnesses as to what the purchasers could or should have paid. The contracts introduced in *United Gas Public Service* imposed obligations upon the producers so different from

those assumed by the plaintiffs that the court concluded the same did not constitute evidence as to the market price of the plaintiffs' gas. Here the record shows the prices paid by other purchasers in comparable sales, and in our opinion the evidence supports the finding of the trial court as to market price.

Although neither Tennessee nor Alamo began taking gas until the latter part of 1960, the Tennessee contracts were executed on or about February 5, 1960. It also is clear that the prices mentioned by Baumel were net to the producer. There is no merit then in respondents' argument that the trial court erred in granting a recovery for the period prior to December 1, 1960, and in failing to deduct gathering costs in addition to the compression charge.

After awarding a money recovery for deficiencies in royalty payments for the period from February 1, 1960, to January 31, 1964, the judgment of the trial court declares that from and after February 1, 1964, those holding under the lessee are obligated to pay as royalty one-eighth of the market value of all gas sold or used off the premises. The Court of Civil Appeals held that since there is no evidence of market price between the date of filing suit and the date of judgment, the declaratory judgment should be modified to provide that the operator is required to pay royalty on the basis of market price from and after the date of judgment. Petitioners say that this was erroneous, because it will deprive them of any right to recover a deficiency in royalty payments between the date of filing suit and the date of judgment.

▮ The Velas contended in the Court of Civil Appeals that the trial court properly gave prospective as well as retrospective operation to the finding that the market price of the gas was 13.047¢ per mcf. This contention is unsound for the reasons pointed out by the intermediate court, but implicit in the argument so advanced is an erroneous construction of the trial court's

judgment. It was the latter that probably led to a modification of the declaratory portion of the judgment. As we construe the judgment of the trial court, it does not purport to give prospective operation to the finding of a market price. Such finding is not determinative of the rights of the parties with respect to gas produced after January 31, 1964. On the basis of that construction, we think the declaratory part of the trial court's judgment should be affirmed. Petitioners are not precluded by the judgment in this case from recovering deficiencies in royalty payments on gas produced after January 31, 1964, upon proof of the prevailing market price at the time such gas was sold or used off the premises. Ben C. Jones & Co. v. Gammel-Statesman Pub. Co., 100 Tex. 320, 99 S.W. 701, 8 L.R.A.,N.S., 1197.

▮ The Court of Civil Appeals also held that the royalty owners were properly denied a recovery of damages for drainage which occurred prior to the time they gave written notice to the lessee as required by the terms of the lease. The lease contains the following provisions:

"In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, before production has been secured or after production has been secured, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has

failed to perform all its obligations hereunder."

Provisions of this nature are included in the lease primarily to protect the lessee against a forfeiture for breach of some express or implied obligation. The parties could not have intended that the lessor would be forever barred from recovering damages sustained prior to the giving of notice, and we hold that the first two sentences quoted above apply only to actions to cancel the lease and not to suits for damages. See Shell Oil Co. v. Stansbury, Tex.Civ.App., 401 S.W.2d 623 (wr. ref. n. r. e., Tex.Sup., 410 S.W.2d 187); General Crude Oil Co. v. Harris, Tex.Civ. App., 101 S.W.2d 1098 (wr. dis.). The purpose of the requirement that the lessee be given notice as a condition precedent to the bringing of suit is to enable the lessee to prepare his defense. Failure to comply therewith may be grounds for abating the suit, but it does not bar the right or constitute a basis for entering a take nothing judgment. See Philadelphia Underwriters' Agency of Fire Insurance Association of Philadelphia v. Driggers, 111 Tex. 392, 238 S.W. 633. The notice provisions quoted above do not constitute a defense to the suit for damages, and the courts below erred in denying a recovery on that ground. The opinions in Kinnear v. Scurlock Oil Co., Tex.Civ.App., 334 S.W.2d 521 (wr. ref. n. r. e.), and Burnett v. R. Lacy, Inc., Tex. Civ.App., 293 S.W.2d 674 (wr. ref. n. r. e.) are disapproved to the extent that they are inconsistent with the views here expressed. This part of the case must be remanded, however, because the trial court made no finding as to the amount of damages for past drainage.

Although the trial court awarded Nordan and Mrs. Gaines a recovery of additional royalty, the Court of Civil Appeals held that they are equitably estopped from claiming that they are entitled to be paid on the basis of market price for the period involved in this suit. The royalty interests owned by such parties were purchased by Nordan and John G. Morris

from the Velas in 1934 after the discovery of gas in the field but before a well was drilled on the leased premises. Shortly after acquiring such royalty interests, Nordan & Morris entered into the gas purchase and sale contracts mentioned above. Morris, who was the husband of Mrs. Gaines, died in 1937 and left her all of his estate. Nordan and Mrs. Gaines retained their rights under the contracts with the lease operators until 1950, when they sold the same to Joe C. Palmer.

The working interest in certain portions of the leased premises was formerly owned by the American Texas Oil Company, which entered into one of the contracts with Nordan & Morris. The company was dissolved in 1941, and its assets were conveyed to the stockholders in proportion to their interests. These conveyances were executed by L. A. Nordan, as surviving President and Director of the company, and by Mrs. Gaines, as surviving Director and Liquidating Trustee thereof. One of the conveyances was to the daughter of L. A. Nordan, and another was to Mrs. Gaines. The latter thereby received a one-fourth interest in the American-Texas Group, and thus became an owner of part of the working interest in addition to her non-participating royalty interest. All of such conveyances expressly ratify and confirm the gas purchase contract.

There is no basis in the record for an ordinary estoppel in pais against either Nordan or Mrs. Gaines. The trial court did not find, and the evidence does not establish as a matter of law, a prejudicial change of position on the part of the working interest owners in reliance on any misrepresentation or silence when there was a duty to speak. It is argued, however, and the Court of Civil Appeals held, that Nordan and Mrs. Gaines are equitably estopped by their acceptance of the benefits of the gas purchase contracts. The court concluded that these parties, after accepting the benefits of contracts which obligated the lease operators to sell all gas produced from the leased premises at a

price of 2.3¢ per mcf, could not claim that they are entitled to be paid royalty on the basis of 13.047¢ per mcf. We do not agree.

According to the doctrine relied upon by the Court of Civil Appeals, sometimes called quasi estoppel, a party who has accepted the benefits of a transaction is precluded from later repudiating the accompanying or resulting obligation. See Theriot v. Smith, Tex.Civ.App., 263 S.W.2d 181 (wr. dis.); United Fidelity Life Ins. Co. v. Fowler, Tex.Civ.App., 38 S.W.2d 128 (wr. dis.); 28 Am.Jur.2d Estoppel and Waiver § 59; 31 C.J.S. Estoppel § 107. Nordan and Mrs. Gaines are not attempting to repudiate or escape any obligation of the gas purchase contracts. In the light of subsequent events the terms of these agreements make the royalty provisions of the lease financially burdensome to the operators, but this affords no basis for denying to Nordan and Mrs. Gaines the right to recover their share of the royalty as provided in the lease. The operators acquired their interests in the leased premises with actual or constructive knowledge of the provisions of the contracts and the lease. It also is clear that the gas purchase contracts were made in good faith, and as previously indicated the royalty owners have never agreed that royalty should be paid on the basis of the price stipulated therein. In our opinion they are not precluded from insisting upon their rights under the lease by the fact that they or their predecessors in title were parties to and accepted the benefits of the contracts.

The position of Mrs. Gaines is different from that of Nordan in one respect. While the latter has had no interest in the leased premises since 1950 other than his nonparticipating royalty, Mrs. Gaines also owned part of the working interest until after the present suit was filed. That circumstance does not, however, deprive her of the right to be paid royalty in accordance with the terms of the lease. She is a party to the suit in two different capacities, one as a royalty owner and the other as owner of part of the working interest in some of the land. The trial court awarded her a recovery of her full share of the deficiency in royalty payments against the American-Texas Group, which includes herself. Since she owned 25% of the working interest, this part of the judgment should have been in her favor against the other members of the Group for 75% of the deficiency in royalty paid on gas produced by such Group.

It is also argued that the judgment in favor of Nordan and Mrs. Gaines cannot stand because they did not prove the amount of royalty they received during the period involved in this suit. The record shows that the Velas were paid on the basis of the price of 2.3¢ stipulated in the gas purchase contracts. There being no evidence to the contrary, the trier of fact could reasonably conclude that all royalty owners were paid on the same basis.

Delhi-Taylor insists that the trial court erred in denying a jury trial on the demand therefor filed by the attorneys representing the Jamison Estate interest. As pointed out by the Court of Civil Appeals, the case was regularly called for trial on February 23, 1965. A jury was available but no demand therefor had been made at that time. The owners of the Jamison Estate interest moved for a continuance, and it was agreed that the case would be postponed until a special non-jury setting on April 12th. The demand for the jury was filed and the jury fee was paid on April 2nd. It was overruled by an order entered on April 9th in which the trial court found that the request was not made a reasonable time in advance of the date set for trial. The court further found that granting the request would require that the case be continued until September, would interfere with the handling of the court's business, and would prejudice the other parties who had made arrangements for the attendance of their witnesses.

Rule 216, Texas Rules of Civil Procedure, requires that the demand for a

jury be made and the necessary fee paid "on or before appearance day or, if thereafter, a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than ten days in advance." We agree with the Court of Civil Appeals that a demand made ten days in advance is not necessarily timely as a matter of law, and that in view of the circumstances mentioned the trial court did not err in denying a jury trial in this case.

Nordan and Mrs. Gaines recognize that they are not entitled to recover any deficiency in royalty payments accruing prior to October 1, 1960, and accordingly filed a remittitur in the Court of Civil Appeals. No complaint has been made concerning the action of the Court of Civil Appeals with respect to the conditional decree provisions of the trial court's judgment, nor is there any attack on its holding that the liability of the members of the American-Texas Group for unpaid royalties is several and not joint. The cause will be severed into three parts so as to preserve these rulings, grant the motion to dismiss, and give Nordan and Mrs. Gaines the relief to which they are entitled here.

The judgment of the Court of Civil Appeals is accordingly set aside, and it is ordered:

(1) That all claims and controversies between Juan M. Vela, Carlos Vela, Ernestina Vela, Emma Vela de Garcia and husband, Jesus M. Garcia, on the one hand, and Texas Oil & Gas Corporation, Claudia L. Eaves and husband, Jack R. Eaves, Anita Nordan Lindsay and husband, Sidney A. Lindsay, Marian Nordan Hudson and husband, Harold W. Hudson, individually and as members of the partnership of Nordan & Company, Hannah D. Gaines and husband, Arthur Gaines (but only in her capacity as a defendant-operator and not in her capacity as a plaintiff-royalty owner), Mrs. Leo G. Moss and husband, Leo G. Moss, Raymond Gibbs, administrator of the estate of C. T. Jamison, deceased, Jessie Faye Gibbs Jamison, a widow, individually and as guardian of the persons and estates of Michael E. Jamison and Patrick Jamison, minors, C. A. Reiter, and Delhi-Taylor Oil Corporation, on the other, be severed, and as to all such claims and controversies the judgment of the trial court is set aside and the cause is dismissed as moot without opinion or adjudication on the merits;

(2) That the judgment of the trial court in so far as it denies L. A. Nordan and Mrs. Hannah D. Gaines any recovery for past or future drainage or the failure to reasonably develop the leased premises, directs Texas Oil and Gas Corporation to drill additional wells and provides that the lease shall be cancelled and terminate in the event additional wells are not drilled in the manner and within the time therein provided, is reversed. These parts of the case are also severed, and as to them the cause is remanded to the district court;

(3) That as to the remainder of the cause:

(a) The judgment of the trial court in favor of L. A. Nordan for royalties due and unpaid is reformed to provide that he recover from Delhi-Taylor Oil Corporation the sum of $1,411.76, from the Venture Group the sum of $4,077.39, from Texas Oil & Gas Corporation the sum of $1,726.95, from Mrs. Hannah D. Gaines the sum of $1,363.12, from Nordan & Company the sum of $1,363.12, from Mrs. Leo G. Moss the sum of $1,226.81, from the C. T. Jamison Estate the sum of $1,226.81, and from C. A. Reiter the sum of $272.62, with interest on each of said amounts from April 12, 1965, at the rate of six per cent per annum;

(b) The judgment of the trial court in favor of Mrs. Hannah D. Gaines for royalties due and unpaid is reformed to provide that she recover from Delhi-Taylor Oil Corporation the sum of $1,058.83, from the Venture Group the sum of $3,057.86, from Nordan & Company the sum of $1,022.34, from Mrs. Leo G. Moss the sum of $920.11, from the C. T. Jamison Estate the sum of $920.11, from C. A. Reiter the sum of

$204.47, and from Texas Oil & Gas Corporation the sum of $1,295.21, with interest on each of said amounts from April 12, 1965, at the rate of six per cent per annum; and

(c) The judgment of the trial court as so reformed is affirmed.

The costs of appeal are taxed one-sixth against the Velas, one-sixth against Nordan and Mrs. Gaines, jointly, and two-thirds against Texas Oil and Gas Corporation, Delhi-Taylor Oil Corporation, and the American-Texas Group, jointly.

Dissenting opinion by HAMILTON, J., in which GRIFFIN, SMITH and GREEN-HILL, JJ., join.

Dissenting opinion by GRIFFIN, J.

## DISSENTING OPINION

HAMILTON, Justice.

I respectfully dissent.

I cannot agree with the Court's holding that the "market price" mentioned in the royalty clause must be determined as of the date of delivery of the gas. While I agree with the Court's holding that the price in the gas sales contracts is not *necessarily* controlling, it could very well be, depending on the circumstances under which the contract price was determined. The burden is on those suing for royalty deficiencies to show that such contract price is not equivalent to the "market price" called for in the lease royalty provision. That burden cannot be discharged by showing the average price for which gas is sold in other long-term gas contracts of sale, unless they are comparable in time (and otherwise) with the contracts under attack. Phillips Petroleum Company v. Bynum, 155 F.2d 196, 201 (5th Cir.1946).

In the oil and gas lease in question the lessees obligated themselves:

"To deliver to the credit of lessor, free of cost, in the pipe line to which lessee may connect its or his wells, the equal one-eighth part of all oil produced and saved from the leased premises.

"To pay to lessor, as royalty for gas from each well where gas only is found, while the same is being sold or used off of the premises one-eighth of the market price at the wells of the amount so sold or used, * * *

"To pay to lessor as royalty for gas produced from any oil well and used by lessee for the manufacture of gasoline, one-eighth of the market value of such gas. If such gas is sold by lessee, then lessee agrees to pay lessor, as royalty, one-eighth of the net proceeds derived from the sale of said casinghead gas at the wells."

It is the second royalty provision we are primarily concerned with here. It will be noted by that provision royalty is to be paid for gas "while same is being sold or used off the premises," as distinguished from gas used by the lessee on the premises for operational purposes, and gas used by the lessor for domestic purposes. For these uses the lease elsewhere provides no royalty is to be paid. The provision says, further, that such royalty shall be one-eighth the "market price" at the wells. No one contends that this means a "market price" established by daily sales at the wells. I quote from the Court of Civil Appeals, Texas Oil & Gas Corporation et al., v. Vela et al., Tex.Civ.App., 405 S.W.2d 68 (1966).

"The royalty to be paid for gas presents a most difficult problem because of the nature of the gas sales, and has been the subject of much litigation. The Courts have recognized, and the undisputed evidence in this case confirms, that the practicalities of the gas industry require that gas be sold under long-term contracts because the pipelines must have a committed source of supply sufficient to justify financing, construction and operation. Therefore, the rules of daily sales and daily quotations have no appli-

cation. Foster v. Atlantic Refining Co., 5 Cir., 329 F.2d 485, Phillips Pet. Co. v. Bynum, 5 Cir., 155 F.2d 196; Gex v. Texas Co., Tex.Civ.App., 377 S.W.2d 820, n. wr. hist."

The phrase "market price at the well" means market price received by lessee less the necessary expense, if any, of processing and transporting the gas from the well to pipeline of purchaser. Le Cuno Oil Co. v. Smith, Tex.Civ.App., 306 S.W.2d 190, n. r. e.; Hemler v. Union Producing Co., D.C.La. 1941, 40 F.Supp. 824, affirmed in part and reversed on other grounds in part, 134 F.2d 436 (5th Cir.); Clear Creek Oil & Gas Co. v. Bushmaier, 165 Ark. 303, 264 S.W. 830.

Since it appears that the royalty provision fails to state as of what time the "market price" is to be determined, I think, we must look to common practices in the industry at the time the lease contract was made in 1933 to ascertain what was the intention of the parties with reference to this matter. All parties agree and this Court so holds that at such time the only sales for gas from wells producing gas only were made on long-term contracts or for the life of the lease. The parties, when they entered into the lease contract, knew how such gas had to be marketed; it had to be marketed under a contract similar to the one before us. Consequently, when the parties entered into the lease contract they all knew that the term "market price" necessarily meant the price prevailing for gas on long-term contract as of the time the sale contract should be made. They knew it could only be sold at a price to be fixed in the contract for gas to be delivered in the future. If the gas contracts in question have provided for a price which at the time was below the prevailing "market price" for gas sold on lease life-time contracts then the lessors would have cause to complain. In the absence of such showing they have no cause for complaint.

This Court in holding that when gas is marketed under a long-term contract the sale is deemed to have been made at the time of delivery to the purchaser, refers to Martin v. Amis, Tex.Com.App. 288 S.W. 431, 433. In this case the lessee executed a written contract to sell raw gas to a gasoline plant in consideration of twenty-five percent of the proceeds of the gasoline manufactured therefrom, and one-half of the proceeds of the residue gas. Lessor contended that he was entitled to one-eighth of all the gasoline manufactured, and one-eighth of all the residue gas as royalty, because the lessor was still the owner of the gasoline and residue gas when sold—no sale ever having been made to the gasoline plant. The gasoline plant, he contended, was a mere servant of the lessor. The Court held that when the gas was delivered to the plant under the terms of the executory contract of sale, an executed sale was thereby effected. Thus, it appears the sale was complete when the gas was delivered, but it took both the contract of sale and its delivery to constitute the sale.

Likewise, in the instant case the mere delivery of gas does not constitute the sale; it takes both the contract of sale plus the delivery to constitute the sale.

The Court, also, relies on the case of Foster v. Atlantic Refining Company, (5th Cir.) 329 F.2d 485, in support of its holding. In that case the court said:

"Atlantic urges that the market price is the price at which the gas was sold in 1950. Developing this point it first says that the phrase 'when run' applies to oil but not to gas on the theory that a 'run' is a transfer of crude oil from stock tanks to a pipeline. *We see no reason why the phrase may not apply to gas and mean the time of delivery of gas from the well to the pipeline. Indeed, a witness for Atlantic so testified.*" (emphasis supplied)

It is noted that the court does not hold that the "market price" is to be determined as

of the time of sale, which under long-term contract is deemed to be at the time of delivery, as held by this Court in the instant case. The *Foster* lease only had one royalty provision which covered both oil and gas, and the Court based it's opinion solely on the provision in the royalty contract, which specifically said that the gas must be sold at the "market price" prevailing when the gas was run. The royalty provision is in part as follows:

"The conventional royalties to be paid by Lessee are: (a) on Oil and gas, including all hydro-carbons, one-eighth (⅛th) of that produced and saved from said land, the same to be delivered to the credit of the Lessor into the pipe line and to be sold *at the market price therefor prevailing for the field where produced when run; * * *.*"

It will be noted under the royalty provision the lessee did not even have authority to sell lessor's one-eighth (⅛th) interest in the gas until it had been delivered to the credit of the lessor in the pipeline. The parties in effect contracted against long-term gas sales contracts. We have no such limitation in the lease before us. Under the terms of the lease the lessee owns all the gas, and it was contemplated by the parties. that it would be sold in the usual and customary manner, that is, under long-term contracts.

It is obvious, therefore, that the *Foster* case should have no persuasive force in determining the question before us in the instant case. There is no intimation that the 5th Circuit would have reached the same result if the contract made by Atlantic had not contained the words "market price when run," thus, clearly and unambiguously obligating it to pay royalties based on market price existing on the date the gas was run or delivered. In fact, it is submitted that there is a clear intimation expressed in the Court's opinion that the "market price" specified in the sales contract (made in good faith, and at the best prices and terms available when the lessee-producer was com-

pelled to "market" the gas) did establish the "market price" for royalty payment purposes if it were not for the peculiar royalty provision requiring a different conclusion.

Although, the lessee in the instant case put himself in no such bind as Atlantic did in its lease, this Court reasons that the lessee is in the same bind that Atlantic was, and has unnecessarily put itself into a strait jacket which it feels compels it to hold as the 5th Circuit felt it was compelled to hold in the *Foster* case. The problem before us is by no means the problem that the 5th Circuit had in the *Foster* case. In that case the lessee bound itself to pay the prevailing "market price" in the field when the gas was delivered. In the case before us the lessee bound itself to pay "market price" for gas sold (necessarily sold under long-term contracts). The lessee did not agree to pay the "market price" prevailing in the field at the time of delivery, but agreed to pay the "market price" of gas sold; that is, sold under long-term contract at a price determined as of the time the contract was made. If the parties understand that the price for which gas was to be sold under long-term contracts had to be determined as of time of making the contract, is it not reasonable to say that they understood that market-price was to be determined as of the same time?

Most of all of the legal commentators who have written on the subject before us favor the view presented here by this dissent. Siefkin, Rights of Lessor and Lessee With Respect to Sale of Gas and as to Gas Royalty Provisions, Fourth Annual Institute on Oil and Gas Law and Taxation, pp. 181, 188–91; Bounds, Division Orders, Fifth Annual Institute on Oil and Gas Law and Taxation, pp. 91, 116–17; Brown, The Law of Oil and Gas Leases, Section 6.09, p. 118 (1958); Gregg, Analysis of Usual Oil and Gas Lease Provisions, 5 South Texas Law Journal 1, 14; 43 Tex.Jur.2d 48, Sec. 389.

I would hold that the lessors recover nothing by virtue of their suit for ad-

ditional royalties. I concur in the Court's holding on their suit for damages for non-development and its remand of the cause to the trial court.

GRIFFIN, SMITH and GREENHILL JJ., join in this dissent.

## DISSENTING OPINION

GRIFFIN, Justice.

I agree with the Court of Civil Appeals in the disposition it made of the recovery sought by Nordan and Mrs. Gaines. Mrs. Gaines' predecessor in title and Nordan purchased gas under the original contract, and at the price therein set out, and paid the owners of the various royalties and mineral interests under this contract. When the corporation was dissolved in 1941 and its assets distributed to Mrs. Gaines and Nordan, they expressly ratified and confirmed the original contract of sale of the gas. In my opinion, Mrs. Gaines and Nordan cannot recover.

## ON MOTION FOR REHEARING

WALKER, Justice.

In their motions for rehearing, respondents correctly point out:

(1) That since L. A. Nordan did not give notice of appeal or except to the trial court's judgment, he is not in position to complain of the action of that court in denying him a recovery for past drainage, West Texas Utilities Co. v. Irvin, 161 Tex. 5, 336 S.W.2d 609;

(2) That neither Nordan nor Mrs. Gaines complained in their motions for rehearing in the Court of Civil Appeals of the modification by that court of the declaratory portion of the trial court's judgment; and

(3) That the judgment of the trial court includes interest on the several money recoveries to November 1, 1965, rather than to April 12, 1965, as we thought when our original opinion was handed down.

The motions for rehearing are accordingly granted, in part, our former judgment is set aside, and judgment is now rendered as follows:

The judgment of the Court of Civil Appeals is set aside, and it is ordered:

(1) That all claims and controversies between Juan M. Vela, Carlos Vela, Ernestina Vela, Emma Vela de Garcia and husband, Jesus M. Garcia, on the one hand, and Texas Oil & Gas Corporation, Claudia L. Eaves and husband, Jack R. Eaves, Anita Nordan Lindsay and husband, Sidney A. Lindsay, Marian Nordan Hudson and husband, Harold W. Hudson, individually and as members of the partnership of Nordan & Company, Hannah D. Gaines and husband, Arthur Gaines (but only in her capacity as a defendant-operator and not in her capacity as a plaintiff-royalty owner), Mrs. Leo G. Moss and husband, Leo G. Moss, Raymond Gibbs, administrator of the estate of C. T. Jamison, deceased, Jessie Faye Gibbs Jamison, a widow, individually and as guardian of the persons and estates of Michael E. Jamison and Patrick Jamison, minors, C. A. Reiter, and Delhi-Taylor Oil Corporation, on the other, be severed, and as to all such claims and controversies the judgment of the trial court is set aside and the cause is dismissed as moot without opinion or adjudication on the merits;

(2) That the action of L. A. Nordan to recover damages for drainage that may have occurred prior to April 12, 1965, the date of trial, is severed, and as to this part of the case the judgment of the trial court is affirmed;

(3) That the judgment of the trial court in so far as it denies L. A. Nordan and Mrs. Hannah D. Gaines any recovery for future drainage or the failure to reasonably develop the leased premises, denies Mrs. Hannah D. Gaines any recovery for past drainage, directs Texas Oil & Gas Corporation to drill additional wells and provides that the lease shall be cancelled and terminated in the event additional wells are not drilled in the manner and within the

time therein provided, is reversed. These parts of the case are also severed, and as to them the cause is remanded to the district court;

(4) That as to the remainder of the cause:

(a) The declaratory portion of the trial court's judgment is reformed as provided in the judgment of the Court of Civil Appeals;

(b) The judgment of the trial court in favor of L. A. Nordan for royalties due and unpaid is reformed to provide that he recover from Delhi-Taylor Oil Corporation the sum of $1,411.76, from the Venture Group the sum of $4,077.39, from Texas Oil & Gas Corporation the sum of $1,726.95, from Mrs. Hannah D. Gaines the sum of $1,363.12, from Nordan & Company the sum of $1,363.12, from Mrs. Leo G. Moss the sum of $1,226.81, from the C. T. Jamison Estate the sum of $1,226.81, and from C. A. Reiter the sum of $272.62, with interest on each of said amounts from November 1, 1965, at the rate of six per cent per annum;

(c) The judgment of the trial court in favor of Mrs. Hannah D. Gaines for royalties due and unpaid is reformed to provide that she recover from Delhi-Taylor Oil Corporation the sum of $1,058.83, from the Venture Group the sum of $3,057.86, from Nordan & Company the sum of $1,022.34, from Mrs. Leo G. Moss the sum of $920.11, from the C. T. Jamison Estate the sum of $920.11, from C. A. Reiter the sum of $204.47, and from Texas Oil & Gas Corporation the sum of $1,295.21, with interest on each of said amounts from November 1, 1965, at the rate of six per cent per annum; and

(d) The judgment of the trial court as so reformed is affirmed.

In all other respects the motions for rehearing are overruled. The parties will have 15 days from this date within which to file motions for rehearing.