No. 54,444

BARBARA HOLMES, Executor of the Estate of Elmer Holmes, Deceased, *Appellee,* v. KEWANEE OIL COMPANY, *Appellant.* EVELYN WOLKINS, *Appellee,* v. KEWANEE OIL COMPANY, *Appellant.* SAM BAIER, *et al., Appellee,* v. KEWANEE OIL COMPANY, *Appellant.*

(664 P.2d 1335)

Opinion filed June 10, 1983.

*Walker A. Hendrix,* of Anderson, Byrd & Richeson, of Ottawa, argued the cause and *Michael C. Smith,* of Gulf Oil Corporation, of Tulsa, Oklahoma, was with him on the briefs for the appellants.

*W. Luke Chapin*, of Chapin, Penny & Goering, of Medicine Lodge, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

HERD, J.: These are consolidated actions on oil and gas leases to recover the difference between royalties paid pursuant to gas purchase contracts and royalties claimed based on market value. The relevant period is 1972 to 1982. The appeal is from the trial court's order awarding the increased royalty payments requested in the amount of $272,391.68, prospective relief and prejudgment interest thereon. The essential facts are undisputed.

The Medicine Lodge gas field was discovered in Barber County in 1927. In 1929, the producer, Barbara Oil Company, executed two gas purchase contracts. The first contract was between Barbara and Harris & Haun, Inc. In 1943 the contract was amended to substitute Zenith Gas Company for Harris & Haun as purchaser. This contract is for the sale of natural gas in interstate commerce and pertains to only one inconsequential lease.

The second contract was entered into between Barbara and the McPherson Oil & Gas Development Company, a drilling company for the Kansas Power & Light Company (KP&L). KP&L later assumed the position of McPherson under the contract. This contract provides for the sale of natural gas intrastate. It covers most of the leases involved in this action.

The market established under the two gas purchase contracts was slow to develop during the depression years of the 1930's. Consequently, many of the oil and gas leases obtained by Barbara did not have production and were allowed to expire during the early years of the gas purchase contracts. The present leases are thus renewal leases and were executed after the two gas purchase contracts had been established. Each lease contains a gas royalty provision which reads for all purposes pertinent to this appeal as follows:

"To pay lessor for gas from each well where gas only is found the equal one-eighth (⅛) of the gross proceeds at the prevailing market rate . . . ."

For many years royalties were paid to the lessors on the basis of the prices paid pursuant to the gas purchase contracts. Price increases were agreed upon by the parties through negotiation. In the late 1960's and early 1970's, however, the market value of natural gas began to exceed the purchase price provided for in

the contracts. Price increases were prevented by long-term contracts and federal regulations. The lessors, who received royalties on the basis of the proceeds received by the producer, became dissatisfied with the arrangement. To increase the amount of royalties they received the lessors argued they should be paid on the basis of the higher market rate of the gas and not the lower purchase contract price. Toward this end lawsuits were filed in Barber County District Court during late 1977 and early 1978 alleging such underpayment of royalties.

After much delay for discovery and negotiations, trial was held before the court in January of 1982. The trial court found for the lessors and awarded them increased royalty payments of $272,391.68, dating from July of 1972 to November of 1981. The court also awarded the lessors prejudgment interest.

The oil producer, Kewanee Oil Company, successor to Barbara Oil Company, appealed. Although not a named party to this action, Gulf Oil Corporation has now acquired the Kewanee Oil Company. Further facts will be developed during a discussion of the issues.

Appellant lists fifteen issues but the basic question is the propriety of the trial court's interpretation of the phrase in the leases "prevailing market rate."

Since this case involves the correctness of the findings of fact and conclusions of law of the trial court, this court's scope of review on appeal should first be noted. In such a case it is the appellate court's function to determine if the findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *City of Council Grove v. Ossmann*, 219 Kan. 120, 126, 546 P.2d 1399 (1976).

The cause of this controversy can best be understood by a brief look at the history of the problem. It has long been recognized that natural gas, unlike oil, cannot be economically stored in tanks to be sold to the first customer who comes along. The sale on delivery of natural gas is accomplished through pipelines. Pipelines are expensive to construct and maintain. In light of these facts gas pipeline companies have historically refused to purchase gas from wells unless the seller signs a long-term contract. To keep pace with rising prices the long-term contracts usually included escalation clauses to afford some relief from the

lengthy commitment. In 1954, however, regulation of natural gas sold in interstate commerce was extended to the producer. *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 98 L.Ed. 1035, 74 S.Ct. 794 (1954). Shortly thereafter the Federal Power Commission, in order to further its policy of keeping gas prices low, suspended operation of escalation clauses in interstate gas contracts. The resulting low prices caused a drop in gas reserve development and interstate commitments. Lack of exploration coupled with rising demand led to rapid price increases in the unregulated intrastate gas market. Substantial price disparities between interstate and intrastate markets and between gas purchase contracts executed at different times thus arose. See Lowe, Developments in Nonregulatory Oil & Gas Law, 32nd Annual Institute on Oil & Gas Law & Taxation 117, 145-46 (1981).

In their attempts to increase the amount of royalties landowners began to rely on "market value" clauses similar to the ones in the leases relevant to this case. Their first major victory came in 1968 when the Texas Supreme Court rendered its decision in *Texas Oil & Gas Corporation v. Vela,* 429 S.W.2d 866 (Tex. 1968). The lease in question there provided the lessee was obligated to

" 'pay to lessor, as royalty for gas from each well where gas only is found, while the same is being sold or used off of the premises, one-eighth of the market price at the wells of the amount so sold or used.' " p. 868.

The lessee argued the market price of gas under the lease was the price provided for in the long-term purchase contract between it and the pipeline. In other words, the producer argued market price meant the amount realized under the contract and not the price of gas unencumbered by long-term purchase contracts or federal regulation. The Texas Supreme Court rejected this argument, stating:

"They [the parties] might have agreed that the royalty on gas produced from a gas well would be a fractional part of the amount realized by the lessee from its sale. Instead of doing so, however, they stipulated in plain terms that the lessee would pay one-eighth of the market price at the well of all gas sold or used off the premises. This clearly means the prevailing market price at the time of the sale or use. The gas which was marketed under the long-term contracts in this case was not 'being sold' at the time the contracts were made but at the time of the delivery to the purchaser. [Citation omitted.] We agree with the Court of Civil Appeals, therefore, that the contract price for which the gas was sold by the lessee is not necessarily the market price within the meaning of the lease." 429 S.W.2d at 871.

During the 1970's the disparity between contract prices under old gas contracts and the prevailing market prices increased. In 1977 the Kansas Supreme Court continued the trend set by the Texas court in *Texas Oil & Gas Corp. v. Vela. Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977), involved several different versions of oil and gas leases. One, however, was for all practical purposes identical to the leases involved in the case at bar. Although there were five separate opinions, a majority of the court clearly agreed that a royalty clause, similar to those here, which calls for gas royalties to be calculated on the basis of market value or market price at the well, refers to value or price at the current rate prevailing when the gas is delivered rather than the proceeds or amount realized under a gas purchase contract.

The court, however, did not stop there. Aside from holding the market value of gas could be higher than the amount of proceeds under the purchase contract, the court stated market value or price could exceed the amount fixed by federal regulations under the Natural Gas Act of 1938 (15 U.S.C. § 717 *et seq.*), holding:

"[T]he existence of federal regulation over the rates which a gas producer may receive is no obstacle to the fixing of a higher rate as the 'market value' of the gas it sells for the purpose of computing royalties." 221 Kan. at 457.

Pursuant to *Lightcap,* then, it was proper for the trial court to set a market value for the purpose of determining the amount of royalties owed different from the proceeds realized under the gas purchase contracts. The question is whether the market values set by the trial court were supported by the evidence. To make that determination it is necessary to examine the trial court's decision in more detail.

The decision below followed closely the testimony of R. Douglas Myers, a consulting petroleum engineer and expert witness for the lessors. Myers reached his determination of market value by determining, at yearly intervals from July 1972 through November 1978, the highest and best price paid for natural gas in the Medicine Lodge area. The results were as follows:

| Production Period | Fair Market Value ($/mcf) | Control |
|---|---|---|
| 7-72 thru 1-73 | 0.1665 | KP&L-Medicine Lodge Field |

| Production Period | Fair Market Value ($/mcf) | Control |
|---|---|---|
| 2-73 thru 11-73 | 0.1850 | ONG-Medicine Lodge Field |
| 12-73 thru 4-74 | 0.5800 | KP&L-Patton-Holmes Wells |
| 5-74 thru 4-75 | 0.8800 | KGS-Beren Corp.-Ives Well |
| 5-75 thru 4-76 | 0.9130 | KGS-Beren Corp.-Ives Well |
| 5-76 thru 4-77 | 2.0350 | KGS-Beren Corp.-Ives Well |
| 5-77 thru 4-78 | 2.0680 | KGS-Beren Corp.-Ives Well |
| 5-78 thru 11-78 | 2.1010 | KGS-Beren Corp.-Ives Well |

It should be noted from May 1974 through November 1978 Myers and the trial court used the price obtained from the "KGS-Beren Corp.-Ives Well." This refers to a gas purchase contract between Okmar Oil Company and the Kansas Gas Supply Corporation. The leases involved in this contract are located approximately six miles east of the Medicine Lodge gas field.

The Natural Gas Policy Act of 1978 (NGPA) (15 U.S.C. § 3301 *et seq.* [Supp. V 1981]) became effective December 1, 1978. Under the Act intrastate gas, for the first time, became subject to federal price controls. Since, for the time being, both intrastate and interstate gas was subject to regulation, Mr. Myers used a regulated price as his market value beginning December 1, 1978. As he testified at trial Myers believed the highest price being paid for gas in Kansas after enactment of the NGPA was the NGPA section 108 "stripper well" price. 15 U.S.C. § 3318.

Basically, a stripper gas well is one which produces 60,000 cubic feet of gas a day or less. Myers also adjusted for the BTU content of the Medicine Lodge field by taking 1.1 times the section 108 price. The "market value" prices determined by Myers after the passage of the NGPA ranged from $2.45 per mcf in December of 1978 to $3.43 per mcf in October of 1981.

Before proceeding to an analysis of the trial court's order it should be noted no mention was made of any distinction between the interstate gas contract (Zenith) and the intrastate contract (KP&L). There are two reasons for this. First, only one lease in this case involves the Zenith contract. That lease ceased to be economically commercial and was allowed to terminate in May of 1978. It involves increased royalties of only $1200. More important, however, is the principle of *Lightcap* that market value is the issue, irrespective of whether the sale is interstate or intrastate. See 3A Summers, The Law of Oil & Gas § 589 (1983 Supp.).

Appellant first argues the royalty owners signed division orders stipulating their royalty interest was ⅛ of the price under the gas purchase contracts, thereby altering the lease contracts. A division order is actually part of the gas purchase contract between the producer and the pipeline. It directs the purchaser to make payment for the value of the products taken in certain proportions which are set out in the order itself. Williams & Meyers, Manual of Oil & Gas Terms, pp. 124-25 (3rd ed. 1971). Here the division orders directed the purchaser to pay to the lessors ⅛ of the price paid pursuant to the gas purchase contract. They were signed by the lessors.

This issue was resolved in *Maddox v. Gulf Oil Corporation,* 222 Kan. 733, Syl. ¶¶ 2 and 3, 567 P.2d 1326 (1977), *cert. denied* 434 U.S. 1065 (1978). The court held:

"A division order is an instrument required by the purchaser of oil or gas in order that it may have a record showing to whom and in what proportions the purchase price is to be paid. Its execution is procured primarily to protect the purchaser in the matter of payment for the oil and gas, and may be considered a contract between the sellers on the one hand and the purchaser on the other."

"Where a division order prepared by the lessee of an oil and gas lease for the lessor's signature unilaterally attempts to amend the oil and gas lease to deprive the royalty owner of interest on royalties held in suspense, to which the royalty owner is otherwise entitled under the leasing contract, and the lessor signs the division order without consideration from the lessee, the provision waiving interest is null and void."

See also *Wagner v. Sunray Mid-Continent Oil Co.,* 182 Kan. 81, 318 P.2d 1039 (1957). We hold the lessors' signatures on the division orders did not alter the leases.

Appellant next argues ratification, estoppel, waiver and acquiescence on the part of the appellees by their having received and kept less than was owed under the terms of the leases. This issue has been resolved in the royalty owners' favor on numerous occasions. In *Foster v. Atlantic Refining Company,* 329 F.2d 485, 490 (5th Cir. 1964), the court stated:

"By keeping less than was due them [the royalty owners], and something to which they were entitled in any event, the Fosters have not ratified the act of Atlantic in selling their royalty gas for less than the prevailing market price."

In *Texas Oil & Gas Corporation v. Vela,* 429 S.W.2d at 876, the Texas Supreme Court held:

"The operators acquired their interest in the leased premises with actual or constructive knowledge of the provisions of the contracts and the lease. It also is

clear that the gas purchase contracts were made in good faith, and as previously indicated the royalty owners have never agreed that royalty should be paid on the basis of the price stipulated therein. In our opinion they are not precluded from insisting upon their rights under the lease by the fact that they or their predecessors in title were parties to and accepted the benefits of the contracts."

We agree and hold the landowners are not barred by ratification, estoppel, waiver or acquiescence.

Let us now turn to a discussion of market value. As previously noted, the trial court made two separate determinations of market value. The first was the pre-December 1978 value. It was based on the highest price paid for comparable natural gas in Barber County at that time. The Okmar contract was the comparable sale used. The second determination pertained to the period after 1978 when intrastate gas became subject to federal regulation. Since there were no unregulated sales at the time that determination was based on the highest regulated price for comparable natural gas in Barber County. The court found the NGPA section 108 price to be the market value of the gas during the second period.

This court has held market value of gas is the "price which would be paid by a willing buyer to a willing seller in a free market." *Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, Syl. ¶ 4. Such price may be proven by any competent evidence. Here the trial court relied on evidence of "comparable sales" as the basis of its decision. "Comparable sales of gas are those comparable in time, quality, quantity, and availability of marketing outlets." *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981). See also *Texas Oil & Gas Corporation v. Vela*, 429 S.W.2d at 872. In *Lippert v. Angle*, 211 Kan. 695, 702, 508 P.2d 920 (1973), we commented on comparable sales, stating, "To be comparable the sales must be similar or under substantially similar conditions." Comparability is a question of fact which will most often be proven by expert testimony. *Weymouth v. Colorado Interstate Gas Company*, 367 F.2d 84, 92-93 (5th Cir. 1966); *Exxon Corp. v. Middleton*, 613 S.W.2d at 249. Thus, as we noted at the outset, our task is to determine whether the trial court's findings regarding market value and comparable sales are supported by substantial, competent evidence.

The trial court's method in making both determinations of market value was essentially the same. Based on the testimony of Mr. Myers, it simply used the highest price paid for comparable

gas in the area both before and after federal regulation of interstate gas. As noted above those prices were obtained from the Okmar contract prior to 1978 and the NGPA section 108 price after 1978. In both instances Myers testified the product for sale was comparable as to physical quality and access to market.

Appellant argues the trial court erred in holding the Okmar contract and the NGPA section 108 sales were comparable. It claims instead the parties intended at the time the leases were executed that the gas purchase contract price was the market price. Obviously our prior discussion in *Lightcap* is applicable here. In that case we held:

"Where a lease calls for royalties based on the 'market value' of the gas sold, in the absence of proof of a contrary intent that value is the price which would be paid by a willing buyer to a willing seller in a free market." 221 Kan. 448, Syl. ¶ 4.

Also relevant here is the rule that an oil and gas lease should be construed strictly against the lessee-producer and in favor of the lessor-royalty owner. *Lightcap*, 221 Kan. at 458; *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 391, 388 P.2d 602 (1964). This is so because the lease is provided by the lessee who dictates its terms. The lessee thus has the opportunity to protect itself through specific terminology in the lease. In the absence of any evidence of contrary intent of the parties, we conclude the lessors are entitled to royalties based on the market value of gas at the time of production.

With regard to the trial court's use of the Okmar contract and the NGPA section 108 price as admissible evidence of market value, we have no hesitancy in upholding these actions. Pursuant to K.S.A. 60-407(*f*) all relevant evidence is admissible except as otherwise provided by statute or constitution. Both standards used by the trial court—the Okmar contract and the NGPA section 108 price—are relevant because of their comparability. As noted above the physical quality and access to market of the gas were similar. Further, there were adequate quantities of each for long-term contracts. Although the use of the NGPA section 108 price may be confusing it is used merely as evidence the gas is worth more than the section 105 price placed on it by the FERC. Just as they are not bound by the gas purchase price, royalty owners with a market value lease are not limited to the regulated price. *Lightcap*, 221 Kan. at 457. This issue is without merit.

Appellant next argues the trial court erred in granting the royalty owners prospective relief based on the section 108 price for the duration of regulation and thereafter the highest price paid for natural gas in Barber County. Appellant maintains that part of the court order unlawfully amends the lease. We agree. The Okmar Contract and the section 108 price are the evidence of market price in this case. They are factual in nature and not controlling on future cases because the market might fluctuate. However, the principles of law enunciated herein are precedential and thereby controlling.

Finally, we must consider the issue of prejudgment interest. The trial court awarded the lessors prejudgment interest on the increased gas royalties at the rate of 6% per annum from the month the original royalty payments were made up to July 1, 1980. After that date and until the date of judgment, February 11, 1982, the rate was 10% per annum. Appellants challenge the propriety of this determination.

It is the "general rule that an 'unliquidated' claim for damages does not draw interest until liquidated—usually by judgment." *Lightcap v. Mobil Oil Corporation,* 221 Kan. at 466; *Columbian Fuel Corp. v. Panhandle Eastern Pipe Line Co.,* 176 Kan. 433, 271 P.2d 773 (1954). Where a party retains and makes actual use of money belonging to another, however, equitable principles require it to pay interest on the money so retained and used. *Shutts, Executor v. Phillips Petroleum Co.,* 222 Kan. 527, Syl. ¶ 20, 567 P.2d 1292 (1977), *cert. denied* 434 U.S. 1068 (1978); *Lightcap,* 221 Kan. 448, Syl. ¶ 12.

*Lightcap* dealt with a situation which required application of both the general rule and the exception noted above. In applying the general rule to the trial court's decision which had rejected prejudgment interest for increased royalties awarded based on the excess of "market value" over the FPC approved rate, the Supreme Court stated:

"As to the amounts which were determined to be due only when judgment was entered below, we believe the general rule as to unliquidated claims should apply. Apart from the question of liability (one of 'initial impression' as noted by the trial court), the amount due if there was liability was not determined until judgment. The 'market value' of the gas sold was subject to proof at trial by any competent evidence. [Citation omitted.] Here plaintiffs chose to rely on the arbitrated value as establishing market value, and that figure was accepted by the trial court in the absence of any other evidence on the issue. Such a result,

however, could not have been foretold before this litigation was well under way, and until that time the total claim was unliquidated." 221 Kan. at 467.

The same is true here. The plaintiffs' claims were unliquidated until the trial court made its determination of market value. We hold the royalty owners were not entitled to prejudgment interest.

The judgment of the trial court is affirmed in part and reversed in part.