**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 5 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ARGORA PROPERTIES L.P., a Texas
Limited Partnership,

      Plaintiff - Appellee,

v.

FOULSTON & SIEFKIN L.L.P., a
Kansas Limited Liability Partnership,
individually and as successor in
interest to Foulston & Siefkin, a
Kansas general partnership,

      Defendant - Appellant.

No. 01-3231
(Kansas)
(D.C. No. 00-CV-1121)

**ORDER AND JUDGMENT**[*]

Before **HENRY, MURPHY** and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

      Foulston & Siefkin L.L.P. (Foulston) appeals a judgment of the United

States District Court for the District of Kansas, pursuant to the Federal

---

      [*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), which decided the amount

of rent Foulston should pay to Argora Properties, L.P. (Argora) under the renewal

clause of a commercial real estate lease and denied prejudgment interest to

Foulston for rent it overpaid to Argora pending resolution of this dispute.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.[1]

*Background*

The Fourth Financial Center (Center) is a landmark, nine-story office tower

erected in 1973 in downtown Wichita, Kansas. Foulston, a Kansas law firm, has

leased space in the Center almost since its opening.[2] Argora currently owns the

Center and is Foulston's landlord. In 1995, Bank IV Kansas, N.A. (Bank IV)

owned the building and occupied most of the available office space. Besides

Foulston, there were six other tenants, including three national accounting firms

and some smaller tenants.

In 1995, Foulston and Bank IV executed a lease agreement for a five year

term. The lease covered 45,424 rentable square feet (rsf) and called for a base

---

[1]We employ straight-line analysis and round off figures to the nearest hundredth.

[2]By 1988, Foulston occupied three floors (six, seven, and eight). The firm's space enjoys a superior finish of fine millwork, preferred access to the elevator banks, an excellent view, the advantage of circulation within its contiguous suite of three floors by means of a private interior stairway, and many other amenities distinguishing it from other office space in the building, except perhaps the executive suites of one other tenant, Bank of America. Nevertheless, the evidence was that the Foulston space could benefit from some refurbishing.

annual rent of $666,828, equating to a rate of $14.68 per rsf per year based on a load factor of 4.82%.[3] A rider to the lease called for the landlord to pay Foulston a remodeling allowance of $340,680, payable in full in the first year of the lease. The value of the remodeling allowance, prorated over the term of the lease, was $1.50 per rsf. A second rider to the lease described the terms and conditions by which Foulston could opt to renew. The meaning of the renewal clause is in dispute:

> Landlord to provide Tenant with two (2) five (5)-year renewal options ***at market rate for comparable space in the Fourth Financial Center***. Tenant must notify Landlord within 90 days of expiration of primary term or renewal term of intent to exercise option.

(Appellant's Appendix Vol. EX. 1 at 30)(emphasis added).

In 1997, the law firm of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P. (Martin Pringle) took up occupancy on the fifth floor of the Center. Its original lease was for a term of ten years. It covered 17,374 usable square feet (usf), with 20,887 rsf (calculated on a load factor of 20%), and called for a base annual rent of $15.32 per rsf. Martin Pringle expanded its space in June 2000 under a second

---

[3]Rentable square footage (rsf) is calculated by applying a negotiated load factor to usable square footage (usf) (the actual space rented). The load factor represents a tenant's use of the common area of the building. Although the 1995 lease between Foulston and Bank IV did not state usf or load factor, the parties agree the usf was 43,336 and the load factor was 4.82%. Employing these numbers, the following calculation yields rsf: 43,336 usf + 4.82% load factor = 45,424 rsf. A higher load factor always results in an increase in rsf. With a static base annual rent figure, a higher load factor will result in a decreased rate per rsf.

lease.  This lease covered 4,728 usf, with 5,507 rsf (calculated on a load factor of 16%), and called for a base annual rent of $15.52 per rsf.[4]  The Martin Pringle space is finely finished, but not to the degree of Foulston's space.  Nor does it enjoy Foulston's other amenities.  For example, unlike Foulston employees, Martin Pringle employees have to traverse common areas in order to access the firm's non-contiguous spaces.

After Argora acquired the building in 1998, there was a significant decline in the market for office space in downtown Wichita.  The decline affected the Center, evidenced by the departure of tenants who had occupied large spaces[5] and failed efforts to re-let the spaces at rates lower in some instances than the rent Argora now demands of Foulston.  At trial, one of Foulston's managing partners acknowledged that Foulston's other options for space outside of the Center, in the event it chose not to renew its lease, included a move to the suburbs that might cost Foulston over $500,000 per year more than what Foulston was paying in rent to Argora.

---

[4]The original Martin Pringle lease provided for base annual rent to rise during the second five years of the term.  Likewise, the expansion lease provided for a rise in rent the last five years of its term.   For simplicity of analysis, we have averaged the tiered base annual rent figures expressed in both the original and expansion leases.

[5]The leases of five of the major tenants were up for renewal in 1998 or 1999.  None of them renewed.

Foulston's lease was to be renewed by April 1, 2000. As that day approached, the parties were unable to reach agreement on "market rate for comparable space in the Fourth Financial Center." Nor could they agree on landlord concessions.[6]   Foulston timely exercised its option to renew. Argora informed Foulston the base annual rent under the renewal clause was $784,125 ($17.26 per rsf based on 45,424 rsf). Foulston disputed the rate. Argora filed suit seeking a declaratory judgment of the amount due under the renewal clause. Pending resolution of the litigation, Foulston paid the higher amount demanded by Argora and counterclaimed for prejudgment interest on any amount the district court found to be overpaid.

At trial, Argora requested the district court to increase Foulston's base annual rent from the 1995 lease figure of $666,828 ($14.68 per rsf) to $797,382 ($16.00 per rsf).[7]   Argora calculated the requested increase using a load factor of 15%, up from 4.82% in the 1995 lease.[8]   Foulston argued its base annual rent

_____

[6]Landlord concessions may include a remodeling allowance, free or reduced-rate parking privileges, rent-free months, cash for moving expenses, cash to pay off obligations on a previous lease, payment of brokerage fees and other like incentives. For simplicity, we consider only remodeling allowance in our analysis of the district court's factual findings.

[7]This figure is recited in the district court's final pretrial order. Pending resolution of this lawsuit, Foulston actually paid the slightly lesser amount Argora originally demanded for the renewal term.

[8]At the time of the Foulston lease renewal, the average load factor in all existing leases in the Center was 19%.

should be reduced to $454,240 ($10.00 per rsf), calculated using the 1995 load factor of 4.82%.

Foulston argues "market rate," as used in the lease renewal clause, means base annual rent inclusive of tenant concessions, and it maintains the rate should take broad market factors into consideration. According to Foulston, "comparable space" in the Center refers to comparable space in 1995, when the lease, with its rider, was signed. Furthermore, Foulston argues the definition of "comparable space" is not limited to physically comparable space, but must also take into account the comparable values of other office leases in the Center, as well as other leases in greater downtown Wichita and its suburbs.

Argora contends "market rate" means base annual rent, derived only from an examination of other rents in the Center prevailing at the time of lease renewal in 2000, with tenant concessions to be negotiated separately. Argora argues "comparable space" should be determined according to conditions existing in 2000, when the lease renewal activated. Argora also maintains "comparable space" means comparable physical space, and argues the market was limited by the terms of the renewal clause itself to spaces only within the Center. Argora believes the space in the Center occupied by Martin Pringle is the space most comparable to that occupied by Foulston and is the space against which the market rate for Foulston's renewal ought to be set.

The district court sided with Argora and concluded "market rate" means base annual rent independent of tenant concessions and "comparable space in the Fourth Financial Center" means comparable physical space only in the Center in 2000. Proceeding from these legal conclusions, the district court applied the 1995 load factor,[9] found the space in the Center occupied by Martin Pringle most comparable to Foulston's space, and set the "market rate for comparable space" in the renewal clause at $16.00 per rsf. The district court denied Foulston prejudgment interest for amounts overpaid pending litigation. From these legal conclusions and findings of fact, Foulston appeals.

As this is a diversity case under 28 U.S.C. § 1332(a), we apply Kansas law. We disagree with the district court's definition of "market rate," but nonetheless affirm its finding of $16.00 per rsf as the appropriate market rate under the lease renewal clause. We concur in its remaining legal conclusions and factual findings.

***Issues Presented***

In our resolution of this appeal, we will address four issues: 1) the meaning of "market rate;" 2) the meaning of "comparable space in the Fourth Financial Center;" 3) a determination of "market rate for comparable space in the Fourth

_____

[9]Notwithstanding Argora's request for a 15% load factor for the renewal term, the district court agreed with Foulston to continue to use the 4.82% load factor operative for its original term under the 1995 lease because it found there was no evidence the parties intended to change this market rate factor.

Financial Center;" and 4) whether Foulston is entitled to prejudgment interest on amounts overpaid to Argora pending litigation.

***Standard of Review***

We review state law determinations of the district court de novo and examine findings of fact for clear error. *Mid-America Pipeline Co. v. Lario Enterprises, Inc.,* 942 F.2d 1519, 1524 (10th Cir. 1991). "A finding of fact is clearly erroneous if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." *Tosco Corp. v. Koch Indus., Inc.,* 216 F.3d 886, 892 (10th Cir. 2000) (quotations and citations omitted).

***Discussion***

We note the district court concluded the language of the contract renewal clause was not ambiguous.[10] Neither party pled ambiguity in the renewal clause, nor do they argue it on appeal.[11]

---

[10]At trial, both parties asserted the renewal clause was not ambiguous. The district court noted this and stated it interpreted the disputed language from within the four corners of the contract. Therefore, in effect, the district court agreed the contract was unambiguous.

[11]Argora briefs ambiguity as an alternative theory. However, we will not take up an issue argued for the first time on appeal, other than sovereign immunity or jurisdiction, "except for the most manifest error." *Sac & Fox Nation v. Hanson,* 47 F.3d 1061, 1063 (10th Cir. 1995), *cert. denied,* 516 U.S. 810 (1995) (quotations and citations omitted). We identify no manifest error in the district court's conclusion the renewal clause was unambiguous.

"The intent of the parties and the meaning of a contract are to be determined from the plain, general, and common meaning of terms used." *Wood River Pipeline Co. v. Willbros Energy Serv. Co.,* 738 P.2d 866, 871 (Kan. 1987). "The fact that the parties do not agree over the meaning of the terms does not in and of itself prove that the contract is ambiguous." *Allied Mut. Ins. Co. v. Moeder,* 48 P.3d 1, 4 (Kan. Ct. App. 2002). In interpreting an unambiguous contract, "[i]t is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context." Restatement (Second) of Contracts § 212 cmt. b (1981). "Any determination of meaning . . . should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Id.; see also, Butts v. Lawrence,* 919 P.2d 363, 367 (Kan. Ct. App. 1996) (citing favorably to identical language in Restatement (Second) of Contracts, § 212 cmt. b (1979)). We agree with the district court that the contract was unambiguous. We believe the extrinsic evidence adduced at trial, in the form of extensive testimony and numerous exhibits, was considered by the district court in aid of understanding the context in which the term "market rate" was employed in the lease renewal clause, but that the district court interpreted the terms in question from within the four corners of the lease rider.

A.     *The meaning of "market rate"*

We agree with Foulston that market rate means base annual rent inclusive of tenant concessions and is influenced by the state of the overall commercial real estate market.  Nonetheless, for reasons which we will explain, we agree with the district court's ultimate decision to set the renewal rate at $16.00 per rsf.

Argora argues base annual rent is a gross figure that alone is equivalent to the market rate.  According to Argora, tenant concessions are negotiated separately and are not reflected in the price per rentable square foot.  We are not convinced the chicken always comes before the egg.  A market, by definition, denotes give and take between the parties.  The sum of the evidence shows a commercial real estate lease is supported by a number of negotiated factors, including base annual rent, load factor and tenant concessions.  While base annual rent is often the opening salvo in a commercial real estate negotiation, each factor through the course of negotiation, influences the parties' attempt to agree on the final market rate.  According to a periodical in the commercial leasing field,

> [w]hen leasing brokers quote prevailing rents, they assume that certain factors will be included in the rents as set.  Obvious factors include the amount of any tenant improvement allowance; free rent; brokerage costs, and other economic factors that are included in the financial arrangements for a new lease.

Raymond J. Werner, *Establishing Rents During Option Terms: The Market Rental*

*Rate Alternative,* 15 NO. 1 Com. Leasing L. & Strategy 1 (2002).[12]

Typical of most negotiations, the process leading to an agreed lease rate involves the adjustment and readjustment of contributing factors throughout the negotiation process on a continual basis and in no particular order. For example, a high tenant remodeling allowance is likely to lead to a high base annual rent, so as to enable the landlord to recoup some of his capital investment. A landlord might entice a prospective tenant into a lease by sweetening the deal with incentives such as one month free rent, parking privileges or a low load factor. Moreover, it is axiomatic that general market conditions affect the overall compression of the lease negotiation process. A weak market will constrain the degree to which a landlord can resist a tenant's request for favorable terms; in a strong market a tenant will have diminished ability to insist on terms.

Therefore, we conclude the term "market rate" in a commercial lease denotes what a willing tenant would pay to a willing landlord in an arm's-length transaction, taking into account all relevant market forces, including those reflected in tenant concessions. Conversely, "market rate" is the price for which a

---

[12]Another factor market rate reflects is the class of the building. Raymond J. Werner, *Establishing Rents During Option Terms: The Market Rental Rate Alternative,* 15 NO. 1 Com. Leasing L. & Strategy 1 (2002). There was dispute at trial whether the Fourth Financial Center (Center) was a Class A or a Class B building. Upon the evidence adduced, the district court correctly found it was a Class A building.

-11-

willing landlord would part with the same property to a willing tenant. If the parties intended "market rate" to refer to base annual rent, they could have easily employed such language. They did not.[13] Notwithstanding the factual difficulty in establishing a market rate based in part on tenant-specific factors such as tenant concessions, we hold the term "market rate" is inclusive of tenant concessions and is determinable in this case.

B.      *The meaning of "comparable space in the Fourth Financial Center"*

Notwithstanding extensive evidence adduced by Foulston, which we see no need to discuss in detail, we agree with the district court that "comparable space" means comparable physical space. The parties who drafted the lease renewal clause pointedly omitted any reference to comparable lease values. Furthermore, because the lease renewal activated in 2000, the district court was correct to analyze comparable space in 2000. Our conclusion adheres to the requirement that we interpret a contract according to the "general, and common meaning of terms used." *Wood River Pipeline Co.,* 738 P.2d at 871. "[W]ords cannot be written into the agreement imparting an intent wholly unexpressed when it was executed." *Id.*

---

[13]Interestingly, neither of the signatories to the 1995 lease testified at trial.

C.    *The meaning of "market rate for comparable space in the Fourth Financial Center"*

While no space in the building shared identical physical attributes with the Foulston law firm, the district court found the space occupied by Martin Pringle most comparable in 2000, although it fell short of the premier degree of finish, amenities and conveniences enjoyed by the Foulston firm.[14]

The district court placed no confidence in the testimony of Foulston's expert witnesses, Grant Tidemann and Roger Turner, and neither do we.  Mr. Tidemann made the extraordinary statement that all space in the building met the test of comparability irrespective of size, location, view, access to amenities, level of finish and contiguity.   Mr. Turner testified that other spaces in the building would be comparable if they were brought up to standard, a statement of the obvious. Mr. Turner initially testified that no space in the building was comparable to Foulston's, but then finally agreed that Martin Pringle's was the most comparable. The evidence demonstrated the spaces formerly occupied by the accounting firms were not physically comparable to Foulston's space.  These spaces had a decided utilitarian finish, inferior access to the elevator lobby, and poor views.  It would cost as much as $35.00 to $40.00 per square foot to bring these spaces up to par

---

[14]There was evidence the Bank of America executive suites were comparable to Foulston's space, but there was no discrete lease information relative to a market rate for comparable Bank of America space.

with Foulston's finish.  We have carefully examined the record and conclude the district court's finding that the Martin Pringle space was most comparable to Foulston's space in April 2000 is not clearly erroneous.

Although we take issue with the testimony of Argora's expert witnesses, and do not share the district court's adoption of their opinion that "market rate" is base annual rent exclusive of tenant concessions, we agree with the district court that the testimony of Foulston's expert witnesses supporting a market rate of $10.00 per rsf under the renewal clause[15] was contrived and unreliable.[16] Foulston's experts testified to an array of tenant incentives to whittle away at base annual rent, such as a deduction for a real estate commission (none was owed), free rent (not offered), a deduction for interest on money Argora might borrow to fund tenant improvements (no evidence Argora would borrow to fund improvements; no evidence of an interest rate), and a ten percent discount based on the size of the Foulston space (unsupported by any evidence).  Such considerations are broader than we are prepared to accept.  Some of them are utterly hypothesized.  Altogether, they are of no discernible application to

---

[15]Although Foulston argued for a $10.00 per rsf market rate,  Mr. Tidemann testified the market rate should be $10.23 per rsf.  Mr. Turner testified the market rate should be $10.00 per rsf.

[16]Mr. Turner testified the base annual rent (described as the "asking rate") under the renewal clause should be $14.10 per rsf ($16.10 per rsf if the Center was considered a Class A building).  Mr. Tidemann testified the base annual rent (described as the "stated rate") should be $14.40 per rsf.

comparable space within the Center.

While we hold that "market rate" represents base annual rent inclusive of tenant concessions and is ordinarily influenced by broad market forces, in this case, the express language of the lease renewal clause restricted the district court to consider the market rate for comparable space within the Center. Even with this restriction, a factual determination of the appropriate market rate for Foulston is not simple. This is because tenant incentives, particularly tenant allowances for improvement to leased property, are typically lease specific. Unlike the ease with which one can consult the *Wall Street Journal* for a stock quote, it is difficult to maintain that the market supports a fixed value for tenant concessions in the commercial lease context. Nonetheless, it is our sense that the base annual rent for Martin Pringle, under its original and expansion leases, reduced by the value of its tenant allowances, is highly suggestive of a fair market rate for Foulston.

In order to fairly compare the lease rates for Martin Pringle and Foulston, we must level the playing field by applying the same load factor to each tenant.[17] Martin Pringle occupied 17,374 usf under its 1997 original lease and 4,728 usf under its 2000 expansion lease. Applying Foulston's 4.82% load factor, Martin Pringle leased 18,211 rsf under its original lease and 4,956 rsf under its expansion

_____

[17]At trial, unrebutted expert testimony established it was an appropriate analytic tool to apply a uniform load factor in comparing leases. It did not matter what load factor was applied, so long as it was consistent.

lease. Martin Pringle's base annual rent under its original lease is $319,989. At 18,211 rsf, its annual rate under the original lease is $17.57 per rsf. Its base annual rent under the expansion lease is $85,469. At 4,956 rsf, its annual rate under the expansion lease is $17.25 per rsf.

We now account for tenant allowances. Martin Pringle's original lease provided for a tenant allowance of $392,360. Prorated over the term of the lease, this amounts to $39,236 per year. Applying this figure to 18,211 rsf translates to an annual allowance of $2.15 per rsf on the original lease. Martin Pringle's expansion lease provided for a tenant allowance of $84,521 over seven years. Prorated over the term of the lease, this amounts to $12,074 per year. Applying this figure to 4,956 rsf translates to an annual allowance of $2.44 per rsf on the expansion lease.

On Martin Pringle's original lease, if we deduct the value of its tenant allowance ($2.15 per rsf) from its base annual rent ($17.57 per rsf), we arrive at a net figure of $15.42 per rsf. On the expansion lease, if we deduct the value of its tenant allowance ($2.44 per rsf) from its base annual rent ($17.25 per rsf), we arrive at a net figure of $14.81 per rsf. These figures represent base annual rent inclusive of tenant allowances, the definition of market rate we employ for purposes of our analysis.

Martin Pringle's $15.42 per rsf rate on its original lease and its $14.81 per

rsf rate on its expansion lease compare favorably to the $16.00 per rsf figure determined by the district court to be Foulston's lease renewal rate.  We conclude the spreads between the Foulston lease renewal rate and the two Martin Pringle rates, articulated above, is easily explained by the premier amenities enjoyed by the Foulston space and evidenced at great length in the record.

Although we disagree with the district court's legal definition of "market rate" as exclusive of tenant concessions, we have considered the record as a whole and find that a market rate of $16.00 per rsf is not clearly erroneous.[18]  "If the judgment is sustainable upon any legal basis, it will be upheld on appeal despite the erroneous or untenable reasons given by that court for its entry."  *Texaco, Inc. v. Holsinger,* 336 F.2d 230, 233 (10th Cir. 1964), *cert. denied,* 379 U.S. 970 (1965).

D.  *Prejudgment Interest*

"It is the general rule that an unliquidated claim for damages does not draw interest until liquidated — usually by judgment.  Where a party retains and makes actual use of money belonging to another, however, equitable principles require it

---

[18]We note a more inexact, though still enlightening, comparison of base annual rents calculated on usf as opposed to rsf: Foulston's renewal lease rate according to the district court order ($16.77 per usf); Martin Pringle's original lease rate ($18.42 per usf); Martin Pringle's expansion lease rate ($18.08 per usf). Argora's expert witness, Ms. Carol Richardson, testified the market for comparable space in the building supported a rate of $18.00 to $18.50 per usf.

to pay interest on the money so retained and used." *Holmes v. Kewanee Oil Co.,* 664 P.2d 1335, 1343 (Kan. 1983), *cert. denied,* 474 U.S. 953 (1985) (quotations and citations omitted). While there is no argument Foulston is entitled to a refund of the spread between the renewal rate ordered by the district court and the amount it paid Argora pending the outcome of this litigation, the district court did not err in denying prejudgment interest. The very nature of the litigation was to establish the amount owed; therefore, it was not liquidated until judgment. Equity fails as a basis for prejudgment interest for the same reason. The equitable remedy rests upon a theory of restitution. It depends on the withholding of a known sum of money belonging to another. *See Lightcap v. Mobil Oil Corp.,* 562 P.2d 1, 16 (Kan. 1977), *cert. denied,* 434 U.S. 876 (1977). The sum of money Argora owed Foulston was unknown until entry of judgment.[19]

---

[19]Foulston argues the district court was not clear in explaining why it rejected prejudgment interest and urges us to remand the case for further explanation. The district court concluded, "[b]ecause of the court's findings and conclusions, Foulston's argument regarding prejudgment interest need not be considered." (Appellant's Appendix Vol. P at 137). We construe this recital to be a conclusion that because the amount of the refund was not determinable until judgment, as evidenced by volumes of testimony debating the applicable market rate, the district court could not award prejudgment interest. The district court does not need to provide further explanation for its ruling.

*Conclusion*

Accordingly, the judgment of the district court is AFFIRMED.[20]

---

[20]Foulston argues the district court failed to consider market rate evidence it presented. Foulston cites to no market rate evidence the district court failed to admit and consider. Our review of the record demonstrates the district court consistently erred on the side of admitting evidence of marginal relevance.

Foulston also complains the district court construed the lease renewal clause against it in the erroneous belief Foulston was the drafter of the clause. There is no evidence the district court considered either signatory to the lease, Bank IV or Foulston, to be its drafter. Nor is there evidence the district court construed the clause against either party.

Finally, there is no evidence to support Argora's claim that Bank IV was Foulston's client at the time the lease renewal clause was negotiated and that this fiduciary relationship required the district court to construe the clause against Foulston.